[S. F. No. 17257. In Bank. Mar. 14, 1947.]

THE VON HAMM-YOUNG COMPANY, LTD. (a Corporation), Respondent, v. CITY AND COUNTY OF SAN FRANCISCO, Appellant.

Robert W. Kenny, Fred N. Howser, Attorneys General, John L. Nourse, James E. Sabine, Deputy Attorneys General, John J. O'Toole, City Attorney, and Walter A. Dold, Chief Deputy City Attorney, for Appellant.

Brobeck, Phleger & Harrison and Robert H. Walker for Respondent.

TRAYNOR, J.—Defendant appeals from a judgment recovered by plaintiff for the refund of personal property taxes levied on its property warehoused in San Francisco on the first Monday in March, 1943.

Plaintiff is an Hawaiian corporation engaged in wholesale and retail merchandising in Hawaii. It purchases merchandise from manufacturers and dealers in various parts of the United States for resale in Hawaii. The corporation is not qualified to do business in California and has never sold any of its merchandise within this state. Before the outbreak of the war with Japan, goods purchased by plaintiff in the various states were shipped directly to Hawaii, via the Panama Canal, or transported by rail to West Coast ports and transshipped to Hawaii. Normally such goods on passing through San Francisco were transferred directly from freight cars to vessels or to the wharves and thence to vessels. Upon the outbreak of war, all shipping to the Hawaiian Islands was halted. Shipping was resumed in March of 1942, under the control of the War Shipping Administration, which operated all American cargo vessels. Commercial shipping to the Islands through the Panama Canal was not resumed, and all goods destined for Hawaii had to be trans-shipped through West Coast ports.

From the time of the resumption of shipping until after the taxes in question were assessed, there was a continuous shortage of vessels for the transportation of merchandise to Hawaii. The War Shipping Administration in cooperation with the government of Hawaii set up a system of shipping permits and allotment of cargo space for shipments from West Coast ports to the Islands.

An importer of goods into Hawaii was required to obtain a permit from an agency of the Hawaiian government before purchasing goods for shipment. These permits were issued on a priority basis, which entitled the importer to cargo space when it became available but did not assure him that such space would be available. The importer also had to obtain an allotment of cargo space from the representative of the War Shipping Administration in San Francisco. Allotments were issued under the direction of a representative of the military governor of Hawaii, and, after control was returned to the civil governor, under the direction of the civil governor's representative. Cargo space was first allotted to food; space that remained was apportioned to other merchandise.

Plaintiff's merchandise consisted of goods other than foods, and during this period there was continuously more of such cargo than could be taken by the available ships. All of plaintiff's goods in San Francisco on tax day were purchased after shipping permits had been obtained. Approximately 89 per cent of the cost value of this merchandise was purchased from sellers outside of California, about 1 per cent from sellers at points in California other than San Francisco, and about 10 per cent from sellers in San Francisco. The trial court found that,

"All of said goods [in the San Francisco warehouses] (except those purchased in San Francisco) had been shipped by rail to San Francisco prior to the first Monday in March, 1943, en route to the Territory; they were all consigned by the shippers to plaintiff at Honolulu, Hawaii. Upon arrival of the goods in San Francisco the railroad notified plaintiff of their arrival. Cargo space was not available for shipment of the goods when they arrived in San Francisco, and plaintiff therefore caused the goods to be delivered to San Francisco warehouses to be held temporarily until cargo space should become available. (Where cargo space was available when goods arrived in San Francisco, they were immediately loaded on vessels and shipped to the Territory.)

"All of such goods were removed from the warehouses, placed on board vessels, and shipped to the Territory as soon as cargo space was allocated for them by the San Francisco representative of the Military Governor of Hawaii. None of such goods were processed or changed in form subsequent to their purchase by plaintiff and prior to their shipment from San Francisco to the Territory; and none of them were held or detained in San Francisco for any purpose other than to await the allocation of cargo space. Plaintiff had urgent need for the goods in the Territory and had ample warehousing space for them there. . . ."

A few items were in the warehouses in San Francisco for as short a time as 18 days, some for as long as nine months, but most of the goods remained in warehouses for from two to three months. The trial court found that the sole reason for the storage was the shortage of shipping space and the system of controls and that the storage was not for the benefit or convenience of plaintiff. Defendant contends that this finding

was not supported by the evidence and that the trial court erred in holding that the tax was levied on personal property in the course of interstate transit in violation of article I, section 8 of the United States Constitution. It is also contended that, in any event, the property purchased in San Francisco had never been in interstate transit and was therefore subject to the tax.

The basic issue with respect to the taxability of the goods that were shipped by rail to San Francisco is whether their storage in San Francisco constituted such a break in their interstate transit as to remove them from the protection of the commerce clause. Neither the fact that the goods had moved in interstate commerce nor the fact that further movement was intended is, alone, a bar to the tax. (*Bacon* v. *Illinois,* 227 U.S. 504, 515 [33 S.Ct. 299, 57 L.Ed. 615].) On the other hand, the fact that the shipper could have diverted the goods from their destination does not remove them from the protection of the commerce clause, if the other facts show that the interstate transit had already begun and the interruption of this transit was only incidental to its continuation. (*Hughes Bros. Timber Co.* v. *Minnesota,* 272 U.S. 469, 476 [47 S.Ct. 170, 71 L.Ed. 359].) The rule governing the break in transit is stated in *Minnesota* v. *Blasius,* 290 U.S. 1, 8 [54 S.Ct. 34, 78 L.Ed. 131], as follows: ". . . the States may not tax property in transit in interstate commerce. But, by reason of a break in the transit, the property may come to rest within a State and become subject to the power of the State to impose a nondiscriminatory property tax. . . . The 'crucial question' in determining whether the State's taxing power may thus be exerted, is that of 'continuity of transit.' *Carson Petroleum Co.* v. *Vial,* 279 U.S. 95, 101 [49 S.Ct. 292, 73 L.Ed. 626]. . . . Formalities such as the forms of billing and mere changes in the method of transportation do not affect the continuity of the transit. The question is always one of substance and in any particular case it is necessary to consider the particular occasion or purpose of the interruption during which the tax is sought to be levied."

The question therefore is what occasion or purpose will bring the property within the jurisdiction of the local taxing authority. If the break in interstate transit is merely incident to the interstate journey, such as a breakdown in the transportation system (*Champlain Realty Co.* v. *Brattleboro,* 260 U.S. 366 [43 S.Ct. 146, 67 L.Ed. 309]), or a delay

to promote the safe or convenient transit of the property (*Champlain Realty Co.* v. *Brattleboro, supra; Kelley* v. *Rhoads,* 188 U.S. 1 [23 S.Ct. 259, 47 L.Ed. 359]), to await ships, or to permit accumulation of sufficient cargo to load a ship (*Carson Petroleum Co.* v. *Vial,* 279 U.S. 95 [49 S.Ct. 292, 73 L.Ed. 626]), the property remains immune from local taxation. A property tax may be imposed on the cargo, however, if the interruption is "not in necessary delay or accommodation to the means of transportation . . . but for the business purposes and profit of the [taxpayer]" (*General Oil Co.* v. *Crain,* 209 U.S. 211, 230-231 [28 S.Ct. 475, 52 L.Ed. 754]; *Susquehanna Coal Co.* v. *South Amboy,* 228 U.S. 665, 668 [33 S.Ct. 712, 57 L.Ed. 1015]), such as a halt to process the goods (*Bacon* v. *Illinois,* 227 U.S. 504 [33 S.Ct. 299, 57 L.Ed. 615]; *Missouri Pacific R. Co.* v. *Schnipper,* 56 F.2d 30), to accumulate a stock of goods to enable the owner to fill orders more readily (*Susquehanna Coal Co.* v. *South Amboy, supra*), to separate the goods for distribution to customers, to place the goods in different containers (*General Oil Co.* v. *Crain, supra*) or to hold the goods for sale. (*Minnesota* v. *Blasius,* 290 U.S. 1 [54 S.Ct. 34, 78 L.Ed. 131]; *American Steel & Wire Co.* v. *Speed,* 192 U.S. 500 [24 S.Ct. 365, 48 L.Ed. 538]; *Brown* v. *Houston,* 114 U.S. 622 [5 S.Ct. 1091, 29 L.Ed. 257].)

█ Defendant contends that the storage in San Francisco served the business purposes of plaintiff by enabling it to purchase merchandise as it became available. Defendant relies on the following uncontradicted testimony of plaintiff's district manager of its San Francisco office: "Q. Was there any reason for doing that [warehousing the goods] other than inability to secure shipping space? A. Yes. A lot of this merchandise was critical merchandise; if we didn't take the merchandise we lost it. In other words, it went to other places. Most of it was bought on a priority and if we didn't take it, why, it would go to other customers by the suppliers. Q. Was there any advantage to your keeping the merchandise in warehouses? A. None whatsoever. . . ." The witness also admitted that the fact that cargo space was limited was known, but he explained the action of the company as follows: "Because you never knew when we were going to get an opportunity to ship merchandise, we would go ahead and get quite a bit of merchandise. Q. What do you mean? A. Matson [the agent of the War Shipping Administration] might get an extra boat and they would call for cargo right away; if we

didn't have it in this port, why, we wouldn't get it shipped.'' Defendant contends that it is clear from this testimony that if storage facilities for merchandise purchased had not been available, plaintiff would have had to forego its purchases, that plaintiff knew that the goods had to be stored, that by making San Francisco a depot for the collection of scarce goods, plaintiff gained a special business advantage, and that because of this beneficial use of local facilities there was a sufficient break in the transit of the goods to remove the bar to their taxation.

It is immaterial, however, what goods plaintiff purchased or why it purchased them. The crucial question is not why the goods were bought, but why they were stored in San Francisco. It cannot be seriously questioned that they were stored there solely because of the inadequacy of shipping facilities, a condition completely beyond plaintiff's control. Plaintiff was engaged in business for profit, and its primary purpose was to get as much goods as possible to Hawaii as rapidly as possible. The goods did not lose their exemption because plaintiff sent them to San Francisco knowing that they would have to be stored there until shipping space became available. In *Champlain Realty Co.* v. *Brattleboro, supra,* the taxpayer floated logs from Vermont to New Hampshire. The boom at the destination, Hinsdale, New Hampshire, was incapable of holding all the logs when the water was high and the current swift. Logs impounded in Brattleboro, Vermont on tax day to await subsidence of high waters were held immune from taxation during this interruption. The logs were sent on their journey in the knowledge that they would be held at the boom in Brattleboro. '' 'In anticipation of the probable high water in the Connecticut, plaintiff had previously placed its boom across West River near its mouth [Brattleboro, Vermont] to hold the wood there until the water in the Connecticut had receded enough to allow it to be held at the mill at Hinsdale.' '' (260 U.S. 366, 368.) The taxpayer in that case not only prepared for the storage of the logs at Brattleboro before sending them on their journey but it used the Brattleboro boom as a substitute for more costly terminal facilities in New Hampshire, for the logs could have continued their journey without delay had the New Hampshire boom been stronger or other facilities provided to receive the logs. (See Powell, *Contemporary Commerce Clause Controversies Over State Taxation,* 76 U.Pa.L.Rev. 773, 781.) Moreover, without the boom

facilities at Brattleboro, the taxpayer could not have floated its logs at the time it chose to do so, just as the plaintiff in the present case could not have sent its goods on to San Francisco had there been no storage facilities there.

In the present case, the storage in San Francisco was not a substitute for storage in Hawaii, for the plaintiff had urgent need for the goods in Hawaii and ample storage space for them there. Although it was known at the time of the shipment to San Francisco that all goods could not be shipped on to Hawaii immediately upon arrival in San Francisco, there was no way of knowing, under the dual system of permits and allotment of cargo space, how long the delay would be or what property would be shipped through immediately. Although the delay was for an indefinite period, it arose entirely from the "lack of facilities for immediate transportation" (*Kelley v. Rhoads*, 188 U.S. 1, 5 [23 S.Ct. 259, 47 L.Ed. 359]) and was not longer than necessary to obtain shipping space. In *Carson Petroleum Co.* v. *Vial, supra*, the United States Supreme Court held that oil brought into a state and held in storage awaiting ships or the accumulation of enough oil to load a ship was immune from local property taxation on the ground that the storage was incidental to the transit of the oil through the state. Similarly, in the present case, the storage of goods brought into San Francisco was incidental to their shipment to Hawaii. There was not, therefore, sufficient break in the continuity of interstate transit to justify the imposition of the tax upon the goods transported by rail to San Francisco en route to Hawaii.

Defendant contends that in any event the goods purchased locally were subject to the tax on the ground that they had never been transported in interstate commerce. The merchandise purchased in California at points other than San Francisco had been delivered to common carriers and had begun their interstate journey. (*Coe* v. *Errol*, 116 U.S. 517, 527 [6 S.Ct. 475, 29 L.Ed. 715].) The same rules govern this property as govern the property purchased outside the state, for the interruption in transit served the same purposes and arose from the same causes. (*Champlain Realty Co.* v. *Brattleboro*, 260 U.S. 366, 373 [43 S.Ct. 146, 67 L.Ed. 309]; *Hughes Bros. Timber Co.* v. *Minnesota*, 272 U.S. 469, 474 [47 S.Ct. 170, 71 L.Ed. 359].)

The only distinction between the goods purchased in San Francisco and the goods obtained elsewhere in California

is that the San Francisco goods were not delivered to common carriers. The regulations of the War Shipping Administration prevented delivery to the carriers that were to transport these goods to Hawaii, and there was no showing that the goods were transported from one place in San Francisco to another by common carriers. The issue with respect to these goods is whether the movement from the place of purchase to the warehouses where they were stored to await the allotment of cargo space was part of their interstate transit. The answer turns upon whether there is any reasonable ground for distinguishing the goods purchased a few miles outside of San Francisco and delivered to a common carrier for shipment to Hawaii but diverted to San Francisco warehouses because of the shortage of shipping space, from the goods transported within San Francisco to warehouses because the wartime emergency regulations prohibited immediate delivery to the carriers that would take them to their destination.

Defendant contends that under the rule of *Coe* v. *Errol,* 116 U.S. 517, 527 [6 S.Ct. 475, 29 L.Ed. 715], the goods were subject to taxation "until they have been shipped, or entered with a common carrier for transportation to another state, or have been started upon such transportation in a continuous route or journey." Under this contention, if the regulations of the War Shipping Administration had permitted plaintiff to deliver the goods to a common carrier to be held under the carrier's control until shipping space became available, the goods would have been immune from taxation, but since plaintiff was not allowed to deliver the goods to common carriers that would transport them to their destination, they remained subject to taxation. The goods were purchased only after shipping permits were obtained for their transit to Hawaii and they were in fact shipped as soon as cargo space was allotted for them by the representative of the Governor of Hawaii. The trial court found that "Plaintiff is not and never has been engaged in business or qualified to engage in business of any kind in the State of California." It is true that goods are not immune from taxation merely because the shipper intends to ship, and subsequently does ship, the goods in interstate commerce (*Minnesota* v. *Blasius,* 290 U.S. 1, 9 [54 S.Ct. 34, 78 L.Ed. 131] ; *Heisler* v. *Thomas Colliery Co.,* 260 U.S. 245, 259 [43 S.Ct. 83, 67 L.Ed. 237]), but when the shipper has done everything possible to deliver the goods to the common carrier for transportation to their final destination, has

never sold the goods locally and lacks the authority to divert the goods into the channels of local trade, he should not be penalized because wartime emergency regulations have prevented him from following the normal practice of the business in delivering the goods directly to the common carriers that will carry them to their ultimate destination. It was recently held in *Richfield Oil Corp.* v. *State Board of Equalization*, —— U.S. ——, —— [67 S.Ct. 156, 163, 91 L.Ed. ——] that insofar as the question of immunity from a state tax on exports under article I, section 10 of the United States Constitution is concerned, delivery to a common carrier is not the sole test of whether the goods involved are subject to a local tax. ''The certainty that the goods are headed to sea and the process of exportation has started may normally be best evidenced by the fact that they have been delivered to a common carrier for that purpose. But the same degree of certainty may exist though no common carrier is involved.'' In that case delivery to a vessel furnished by the purchaser was held sufficient to show such certainty of exportation. The court recognized that rules for determining when goods are in the process of exportation under the Export-Import Clause are not always the same as the rules for determining when interstate transit has commenced (—— U.S. at —— [67 S.Ct. at 159, 91 L.Ed. ——]) but the basic principle is the same, namely the certainty that the goods have been committed to a movement outside the state and will not be diverted into the channels of local trade. In view of the certainty in the present case that the goods were committed to a movement outside the state and would not be diverted into the channels of local trade, the fact that shipping permits had already been obtained for the goods, and the impossibility under the wartime emergency regulations of delivering the goods directly to the common carriers that were to transport them to Hawaii, the movement of the goods from the place of purchase to the warehouses must be considered a movement in interstate commerce just as it would have been had the goods been delivered directly to the common carriers and held under their control until shipped.

■ Defendant also contends that the property tax, even if it did not apply to the bulk of the property in transit, applies to plaintiff's intoxicating liquor stored in the San Francisco warehouses on tax day, on the ground that under the twenty-first amendment to the federal Constitution the state

may regulate interstate traffic in alcoholic beverages. The twenty-first amendment merely prohibits the importation of intoxicating liquors into a state ''for delivery or use therein . . . in violation of the laws thereof. . . .'' Defendant relies on the concurring opinions in *Duckworth* v. *Arkansas,* 314 U.S. 390, 397 [62 S.Ct. 311, 86 L.Ed. 294, 138 A.L.R. 1144]; and *Carter* v. *Virginia,* 321 U.S. 131, 139 [64 S.Ct. 464, 88 L.Ed. 605]. These opinions were concerned, not with the taxation of property in transit, but with the regulation of such transit to prevent evasion of local laws. Moreover, the majority opinion in both cases rejected the view that the twenty-first amendment was applicable to the transportation of alcoholic beverages *through* a state. (See, also, *Johnson* v. *Yellow Cab Transit Co.,* 321 U.S. 383, 386 [64 S.Ct. 622, 88 L.Ed. 814]; and cases collected in 84 L.Ed. 137; 55 Yale L.J. 815.)

The judgment is affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Schauer, J., and Spence, J., concurred.