[Sac. No. 5893. In Bank. June 15, 1948.]

EMPRESA SIDERURGICA, S.A. (a Corporation of Colombia, South America) et al., Respondents, v. COUNTY OF MERCED et al., Appellants.

Fred N. Howser, Attorney General, James E. Sabine, Deputy Attorney General, and Frank C. Hale, District Attorney, for Appellants.

Scott D. Kellogg, Raymond Salisbury and Betsy FitzGerald Rahn for Respondents.

EDMONDS, J.—The status of personal property sold to a foreign purchaser but in this state on tax day is the question presented for decision by the county of Merced upon its appeal from an adverse judgment in an action to recover taxes. Although part of the property had been prepared for export, the greater portion of it was not in that condition and all of it was located at the plant of the seller in Merced County.

The following facts were presented by stipulation. In November, 1944, Empresa Siderurgica, S. A., a corporation organized under the laws of Colombia, South America, agreed to buy from Henry J. Kaiser Company the machinery and equipment of a cement plant. The contract of sale provided that title to the property should be transferred to the purchaser whenever it had furnished a letter of credit and an export license issued by the appropriate governmental agency.

Early in January, 1945, the required license had been obtained and a satisfactory letter of credit covering the unpaid balance of the purchase price deposited with a bank. The work of dismantling the plant and packaging it for shipment was then commenced by Bigge Drayage Company, pursuant to a contract made by it with the purchaser's forwarding agent. The Bigge Company conducts a general trucking business and is a common carrier by motor vehicle, licensed by the Interstate Commerce Commission to engage in interstate and foreign commerce.

The dismantling and packaging operations continued expeditiously, with due regard for war-time shipping conditions, throughout the succeeding months, the packages being labeled at the plant site with the name of Empresa, as consignee. The specified place of delivery was Medellin, Colombia, South America. By March 5, 1945, the statutory date for the assessment of property for the tax year 1945-46, 12 per cent of the plant had been shipped out of the county; 10 per cent had been dismantled and crated or prepared for shipment; 34 per cent had been dismantled but not crated or prepared for shipment; and 44 per cent had not been dismantled. Not later than January 18, 1946, all of the machinery had been shipped out of the county of Merced on cars of the Atchison, Topeka, and Santa Fe Railway Company, and before the end of that month was enroute to South America by ocean carrier.

The original assessment, made upon the basis of the value of the entire plant, was reduced by the board of supervisors

to require payment of taxes only upon the 88 per cent of the plant which was in the county on tax day. Empresa paid under protest the amount of the tax computed accordingly.

The position of the county is that, on tax day, none of the property assessed had begun its journey to a foreign destination and, therefore, had not acquired the status of an export. Until the goods have been delivered to a common carrier for transportation, they say, such property is not an export and may be taxed. Empresa maintains that, at the time of the assessment, the plant was an export because by the agreement for the sale of the property the parties intended foreign shipment and neither party could prevent its exportation without breaching the contract. It is also argued that because of Bigge's license as a common carrier, the delivery of possession to that company was the same as delivery to a railroad or a ship; the foreign destination was fixed and if on tax day any part of the plant was an export, all of it came within that category.

■ Article I, section 10, clause 2, of the Constitution of the United States provides: ''No State shall without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports. . . .'' The trial judge determined, as a matter of law, that when the goods have been committed to exportation, a tax imposed upon them amounts to taxation of an export. Another basis for the decision was that ''proceeding to change . . . [the plant] from parts in place of a complete building, into a mass of disconnected materials made the completion of the exportation economically imperative. This was not a mere preparation of the plant for exportation; by such action and change the parts had 'been started upon such transportation' with the degree of certainty demanded by *Coe* v. *Errol,* [116 U.S. 517 (6 S.Ct. 475, 29 L.Ed. 715)] and the many cases which have endorsed it.''

In the Coe case logs had been floated down a river to the town of Errol, where they were to be shipped in interstate commerce. The town's assessment of them was attacked upon the ground that, at the time of the levy, they were in such commerce and not subject to taxation. The court, in deciding against the property owner, stated that ''no definite rule has been adopted with regard to the point of time at which the taxing power of the State ceases as to goods exported to a foreign country or to another State.'' (P. 527.) But it declared ''that such goods do not cease to be part of the gen-

eral mass of property in the State, subject, as such, to its jurisdiction, and to taxation in the usual way, until they have been shipped, or entered with a common carrier for transportation to another State, or have been started upon such transportation in a continuous route or journey. . . . It seems to us untenable to hold that a crop or a herd is exempt from taxation merely because it is, by its owner, intended for exportation. If such were the rule in many States there would be nothing but the lands and real estate to bear the taxes. Some of the Western States produce very little except wheat and corn, most of which is intended for export; and so of cotton in the Southern States. Certainly, as long as these products are on the lands which produce them, they are part of the general property of the State. And so we think they continue to be until they have entered upon their final journey for leaving the State and going into another State. . . . But this movement does not begin until the articles have been shipped or started for transportation from the one State to the other. The carrying of them in carts or other vehicles, or even floating them, to the depot where the journey is to commence is no part of that journey. That is all preliminary work, performed for the purpose of putting the property in a state of preparation and readiness for transportation. Until actually launched on its way to another State, or committed to a common carrier for transportation to such State, its destination is not fixed and certain'' (pp. 527, 528). Although this decision was based upon the commerce clause of the Constitution, the same principles have been stated and followed in the few cases which have applied either article I, section 10, clause 2, or article I, section 9, clause 5 of the Constitution. (*Richfield Oil Corp.* v. *United Bd. of Eq.*, 329 U.S. 69, 79 [67 S.Ct. 156, 91 L.Ed. 80]; *Turpin* v. *Burgess*, 117 U.S. 504, 506 [6 S.Ct. 835, 29 L.Ed. 988]; *Brown* v. *Maryland*, 12 Wheat. (U.S.) 419 [6 L.Ed. 678].)

In *Von Hamm-Young Co.* v. *City and County of San Francisco*, 29 Cal.2d 798 [178 P.2d 745, 171 A.L.R. 274], relied upon by Empresa, goods purchased in San Francisco and moved from the place of purchase to warehouses to await shipping space were held to be exempt from tax because of the commerce clause. It was there said that ''the movement of the goods from the place of purchase to the warehouses must be considered a movement in interstate commerce . . .''

(P. 807.) In the present case, there was no movement of the goods from the place of purchase. The Bigge Company, which had the contract for dismantling and packaging, performed this function at the plant site. Eventually, the packaged goods were delivered to the railroad company, whose tracks ran alongside the plant site, for transportation to the port of embarkation. But except for the 12 per cent of the machinery which was not in the county on tax day, none of the packages had been delivered to the railroad carrier.

In the Richfield Oil Corporation case, *supra,* the court said: "The certainty that the goods are headed to sea and that the process of exportation has started may normally be best evidenced by the fact that they have been delivered to a common carrier for that purpose. But the same degree of certainty may exist though no common carrier is involved." (P. 82.) In that case the plaintiff corporation sold oil to the New Zealand government f.o.b. its tanker at Los Angeles for export to that country. Although title passed upon delivery to the tanker, a sales tax was levied against the gross amount of the sale. After payment, plaintiff sued for refund, invoking the exemption of section 10, article I of the Constitution. The tax was held invalid because delivery to the purchaser's carrier constituted the commencement of exportation to the same extent as would delivery to a common carrier in the usual situation. The court stated, "Delivery was made into the hold of the vessel from the vendor's tanks located at the dock. That delivery marked the commencement of the movement of the oil abroad." (P. 83.) As in *Coe* v. *Errol, supra,* the determining factor was not the owner's intention to export but whether or not exportation had commenced.

On tax day, the machinery which is the subject of the assessment here under attack had been delivered into the possession of the forwarding agent for the purpose of packing and shipping it. But the preparations for shipment, including the preparation of foreign documents and bills of lading, negotiations for shipping space by rail and sea and incidental activities in readying the machinery for shipment out of the country are not the equivalent of delivery to a common carrier for transportation. The fact that the Bigge Company was licensed as a common carrier in interstate and foreign commerce is not material, for it was not employed to perform the functions of such a carrier; it undertook only to dismantle and prepare the property for shipment. It cannot, therefore,

be seriously contended that delivery of possession to Bigge was equivalent to delivery to a common carrier for transportation.

 The property owner's argument that because 12 per cent of the plant had been shipped out of the county and was clearly an export, the remaining 88 per cent, whether dismantled and packaged or not, was likewise an export, cannot be sustained. This contention assumes that intention to export rather than the commencement of exportation is the determining factor. The fact that a portion of the plant had actually been shipped is not controlling as to that portion which was in the process of preparation for exportation, although there can be no question concerning the owner's intention to take it out of the country. "The exemption attaches to the export and not to the article before its exportation. . . ." (*Cornell* v. *Coyne*, 192 U.S. 418, 427 [24 S.Ct. 383, 48 L.Ed. 504].)

The judgment is reversed.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.

Respondents' petition for a rehearing was denied July 8, 1948.