EMPRESA SIDERURGICA, S. A., ET AL. *v.* COUNTY
OF MERCED ET AL.

No. 327. · Argued February 9, 1949.—Decided May 31, 1949.

*Scott D. Kellogg* argued the cause and filed a brief for
appellants.

*James E. Sabine,* Deputy Attorney General of California, argued the cause for appellees. With him on the brief were *Fred N. Howser,* Attorney General, and *Gregory P. Maushart.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

There was a cement plant in Merced County, California, which was sold to petitioner—a corporation of Colombia—for export to South America. An export license was obtained and a letter of credit in favor of the seller deposited here. Title passed and possession was taken for the purchaser. A company, which was a common carrier, was employed to do the dismantling and packaging for shipment. As the dismantling proceeded, shipments were labeled with appellant's name as consignee and delivered to a rail carrier.

Respondent, acting under a California statute,[1] levied a personal property tax on the property for the tax year 1945–1946. The tax date was March 5, 1945. On that date 12 per cent of the plant had been shipped out of the county. That portion was relieved of the tax. The balance was taxed. That included the 10 per cent which had been dismantled and crated or prepared for shipment, 34 per cent which had been dismantled but not crated or prepared for shipment, and 44 per cent which had not been dismantled. But before the end of January, 1946, all the property had been shipped by rail to a port and was en route to South America by ocean carrier.

Article I, § 10, Cl. 2 of the Constitution provides in part that, "No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing it's inspection Laws . . . ." Appellant claimed

---

[1] Rev. and Tax. Code (Deering, 1939), Div. I, §§ 103, 106, 201, 202 (e), 405.

that this tax was laid on an export and was therefore unconstitutional. It paid the tax under protest and brought this suit to recover it. The trial court, holding that the entire plant was an export on the tax assessment day, granted judgment for appellant. The Supreme Court of California reversed. 32 Cal. 2d 68, 194 P. 2d ·527. The case is here on appeal. 28 U. S. C. § 1257 (2).

". . ᴧ goods do not cease to be part of the general mass of property in the State, subject, as such, to its jurisdiction, and to taxation in the usual way, until they have been shipped, or entered with a common carrier for transportation to another State, or have been started upon such transportation in a continuous route or journey." *Coe* v. *Errol,* 116 U. S. 517, 527. That test was fashioned to determine the validity under the Commerce Clause of a nondiscriminatory state tax. But as we noted in *Richfield Oil Corp.* v. *State Board,* 329 U. S. 69, 79, it is equally applicable to cases arising either under Art. I, § 10, Cl. 2 (the Import-Export Clause) or under Art. I, § 9, Cl. 5, which prohibits Congress from laying any tax on "Articles exported from any State." [2]

Under that test it is not enough that there is an intent to export, or a plan which contemplates exportation, or an integrated series of events which will end with it. See *Turpin* v. *Burgess,* 117 U. S. 504; *Cornell* v. *Coyne,* 192 U. S. 418. The tax immunity runs to the process of exportation and the transactions and documents embraced in it. *Fairbank* v. *United States,* 181 U. S. 283; *United States* v. *Hvoslef,* 237 U. S. 1; *Thames & Mersey Ins. Co.* v. *United States,* 237 U. S. 19. Delivery of packages to an exporting carrier for shipment abroad (*Spalding & Bros.* v. *Edwards,* 262 U. S. 66) and the delivery of oil into the hold of the ship furnished by the foreign purchaser to carry the oil abroad (*Richfield Oil Corp.* v.

---

[2] The meaning of "export" is the same under the two Clauses. See *Richfield Oil Corp.* v. *State Board,* 329 U. S. 69, 83 and cases cited.

*State Board, supra*) have been held sufficient. It is the entrance of the articles into the export stream that marks the start of the process of exportation. Then there is certainty that the goods are headed for their foreign destination and will not be diverted to domestic use. Nothing less will suffice.

So in this case it is not enough that on the tax date there was a purpose and plan to export this property. Nor is it sufficient that in due course that plan was fully executed. Part of the plant that is taxed was dismantled, but it had not been delivered to any carrier for export or otherwise started on its journey on the tax date. It might still have been diverted into the domestic market. The fact that any such diversion would entail a breach of contract, that a part of the plant had already started on its export journey, that an export license had been obtained and a letter of credit deposited in this country increases the expectation on the tax date that exportation of the entire plant would eventuate. But that prospect, no matter how bright, does not start the process of exportation. On the tax date the movement to foreign shores had neither started nor been committed.

Some reliance is apparently placed on the fact that the dismantler was a licensed carrier for interstate and foreign commerce and that its employment included the loading of the property on railroad cars for shipment to the seaboard. But the dismantler had not in this case started the movement of the property to the rail carrier. Hence we need not determine whether that intermediate transportation would be part of the export process.

*Affirmed.*

MR. JUSTICE FRANKFURTER, dissenting.

Though figures of speech may aid analysis, they do not dispense with the need for it. When a State seeks to tax what is to leave the United States, we may agree

that its privilege to do so ceases when the export enters "the export stream." But the problem for decision is to determine when that point has been reached. The Export-Import Clause of the Constitution (Art. I, § 10) embodies one phase of the accommodation between the States and the Union; it can be applied only by considering the bearing of a particular exertion of State power on the fulfillment or frustration of its purpose. A mechanistic formula, whether derived from phrases in *Coe* v. *Errol,* 116 U. S. 517, or elsewhere culled, advances us little toward the solution of such a concrete problem.

The case before us is peculiarly ill-fitted for mechanical disposition; it presents unusual circumstances giving rise to unusual contentions. It involves the sale to a Colombian purchaser of what the contract of sale describes as "all machinery, equipment, removable structures, removable facilities, spare parts, supplies and miscellaneous items comprising" the Yosemite Portland Cement Plant located at Merced, California, but "excluding the land upon which the plant is situated" and various other specified items. The appellant urges that the objects of this sale, which are collectively referred to by the contract as "the cement plant," should be regarded as interdependent parts of an organic whole like a 200-inch telescope or a cyclotron. Since no such part has a separate usefulness comparable to its usefulness as a supporting member of the structure or as a link in the productive process for which the structure is designed, shipment of part—in this case 14 of an eventual total of 123 carloads—makes virtually certain that the rest will follow. In the case of such an export, so runs the argument, it is a degree of certainty fully equivalent to the certainty marked by delivery to a common carrier of a bulk cargo, like oil or grain or timber, for whatever part of a cargo of the latter sort has not actually left the country can

even then be diverted and separately sold without loss in value either to the diverted or to the exported part. It is the degree of certainty, moreover, and not conformity to a prescribed ritual like delivery to a carrier, that is significant:

> "The certainty that the goods are headed to sea and that the process of exportation has started may normally be best evidenced by the fact that they have been delivered to a common carrier for that purpose. But the same degree of certainty may exist though no common carrier is involved." *Richfield Oil Corp.* v. *State Board,* 329 U. S. 69, 82.

The case was submitted to the Superior Court of Merced County on an agreed statement of facts which leaves in doubt whether the items comprising the "cement plant" were actually interdependent, as appellant contends, or consisted merely of a collection of machines and other pieces of equipment which could have been individually installed without loss of usefulness in any other cement plant. Tending to establish appellant's position are provisions of the dismantling contract which indicate that the existing structure was to be carefully taken apart like a Chinese puzzle so that it could be fitted together again in Colombia exactly the way it was before. "Contractor shall take at least one photograph of each machine or piece of equipment before dismantling said machine or piece of equipment, and shall also take at least one photograph after such machine or piece of equipment is dismantled." "All separations shall be made at the point of joinder, and there shall be no cutting or disassembling of any part of the Cement Plant which will have as its effect the weakening of the structure or parts when such structure or parts are reassembled . . . ." "The Contractor shall match-mark all parts of the plant and equipment . . . ."

Tending to look the other way is an itemized list of all the items to be exported which was attached to the export license issued to appellant by the War Production Board. Those items, ranging from thousand-ton kilns and locomotives to friction tape, seem to be things of a sort which are independently useful; each is assigned a dollar value and the total of all these separate values exactly equals the sale price of the "plant." Appellee insists, moreover, that so many parts of the original plant were excepted from the contract of sale that what was sold cannot be considered an organic unit.

The Superior Court resolved this issue of fact in favor of the interpretation urged by appellant and reached a conclusion based on that interpretation:

> "I think that the payment for the property and proceeding to change it from parts in place of a complete building, into a mass of disconnected materials made the completion of the exportation economically imperative. This was not a mere preparation of the plant for exportation; by such action and change the parts had 'been started upon such transportation' with the degree of certainty demanded by Coe vs. Errol and the many cases which have endorsed it. . . .
>
> "If the exportation of the materials of the plant was not before assured, that became certain when the twelve per cent of the corpus of the building had been sent abroad. . . . Whatever possibility there might have been that after plaintiff had torn the plant down and carried the parts off the premises that it would sell them or re-erect them into a plant in California would be rendered extremely improbable when it appeared that it had kept here only a part of the

materials of the plant which of course could not be sold as the materials from which a plant could be built or used to reassemble the old one."

The appellant presented the same contentions to the Supreme Court of California. Without explicitly rejecting these contentions, it referred to the objects of export and of taxation merely as "the machinery and equipment of a cement plant" and alluded to the above-quoted portion of the Superior Court's opinion only as "another basis for the decision." Its opinion is open, therefore, to two very different interpretations.

1. The Supreme Court of California may have exercised a right under California law to draw its own inferences from uncontroverted facts and thus have found that what was called a "plant" was really only a collection of machinery and equipment. If that is what it did, we would not, of course, reinstate the findings of the Superior Court merely in order to raise an interesting question under the Export-Import Clause. Affirmance would be amply supported by bare citation of cases holding that intent to export, no matter how firm, is not by itself enough to confer immunity from taxation.

2. The Supreme Court of California may have taken the view that only delivery to a carrier of each successive part even of an organic whole removed that part from the State's taxing power. This would have been in effect to say, "Upon the facts as found by the Superior Court, it makes no difference to the taxing power of the County of Merced that parts of this integrated plant had left the country since the County is merely taxing the remaining parts." Surely this is a doubtful proposition; it presents, at any rate, a difficult question of the adjustment of local needs to the protection of exports from local interference.

Between these two possible interpretations of the situation before the Supreme Court of California, therefore, lies the difference between a simple question of Constitutional power and a very troublesome one. Since the record leaves in doubt whether the troublesome question is presented, to assume that it is presented and then to pass upon it would be to embrace unnecessarily what may be a hypothetical issue. We should, therefore, remand the case for the resolution of the crucial question of fact upon which depends what Constitutional issue we are called upon to decide. Cf. *Hammond* v. *Schappi Bus Line, Inc.,* 275 U. S. 164.