[Civ. No. 28510.   Second Dist., Div. Four.   Apr. 26, 1966.]

HUGO NEU CORPORATION, Plaintiff and Appellant, v. COUNTY OF LOS ANGELES et al., Defendants and Respondents.

Buchalter, Nemer, Fields & Savitch, Murray M. Fields and Stuart D. Buchalter for Plaintiff and Appellant.

Harold W. Kennedy, County Counsel, and DeWitt W. Clinton, Deputy County Counsel, for Defendants and Respondents.

KINGSLEY, J.—In this action, tried on a stipulation of facts and attached exhibits, plaintiff corporation sought to recover property taxes paid under protest. Plaintiff filed a complaint pursuant to Revenue and Taxation Code section 5138, alleging that defendants had levied a tax on scrap iron in violation of article I, section 10, clause 2 of the United States Constitution, the export clause. The trial court made findings of fact and conclusions of law and, by memorandum opinion, rendered judgment for defendants. Plaintiff has appealed.

Hugo Neu Corporation, the plaintiff, during the tax year concerned, was an exporter of iron and steel scrap. On March 10, 1961, plaintiff entered into a "long range agreement" with several Japanese corporations which provided that, during a period beginning in April 1961 and ending in March 1962, if the Japanese buyers notified the sellers of the amount ordered, plaintiff would sell prepared scrap of a specified composition. After entering into the agreement, plaintiff purchased 8,345 long tons of prepared scrap of the type covered by the agreement and, between November 1, 1961, and March 3, 1962, shipped it by railroad common carrier to its storage depot at Terminal Island, Los Angeles. Additionally, plaintiff purchased 4,125 long tons of prepared scrap of a type not covered by the agreement, and, between May 1961 and February 1, 1962, shipped it by railroad common carrier to its storage depot in Terminal Island.

During the fourth quarter of the period covered by the agreement, i.e., from January 1, 1962, to March 31, 1962, the Japanese buyers did not notify plaintiff of the quantity of prepared scrap to be shipped under the agreement. On February 10, 1962, in view of the failure of the Japanese mills to notify plaintiff of the quantity of prepared scrap to be purchased and shipped, plaintiff contracted to sell to The Gosho Company of Japan *approximately* 2,000 long tons of prepared scrap of a type not covered by the agreement.

On February 26, 1962, the Japanese buyers notified plaintiff they desired to purchase 55,000 long tons of prepared scrap, and by addendum to the "agreement" the fourth quarter was extended to cover the period April 1, 1962, to June 30, 1962.

According to stipulated fact XII: "On the tax lien date, March 5, 1962, 12,470 long tons of prepared scrap owned and possessed by plaintiff was located on Terminal Island awaiting sale." This consisted of the original 8,345 long tons of prepared scrap purchased for the purpose of meeting plaintiff's potential obligation to the Japanese buyers, 2,000 long tons of other scrap held in order to meet the commitment to The Gosho Company, and 2,125 long tons of scrap for which no commitment then existed. The scrap held for shipment to The Gosho Company was not, on the tax lien date, physically separated from other scrap owned and possessed by plaintiff at the Terminal Island yard.

Thereafter, on March 16, 1962, the vessel *SS James Monroe* arrived at Terminal Island; it departed on March 18, 1962,

carrying 2,183 long tons of scrap consigned to The Gosho Company and 1,024 long tons of scrap, title to which remained in plaintiff but which it expected to sell to some buyer in Japan. On March 29, 1962, the 1,024 long tons were sold to Mitsui & Co.

## I

The first issues presented in this appeal are whether the court erred in making findings of fact in a case where the parties submitted the matter as an agreed case on a stipulation of facts, and whether those findings by the judge were contrary to the stipulated facts. The finding by the judge that is specifically objected to is Finding VIII, which reads as follows: ''All of the above described scrap was assembled at Terminal Island in the expectation of eventual export, but neither at the time of its arrival at Terminal Island nor at any time thereafter to and including March 5, 1962, had it been invoiced to, or paid for by any purchaser, nor allocated to a particular shipment, nor consigned, nor sold to a particular foreign buyer. The materials were at Terminal Island, and their future destination was undecided. On the tax date all movement had stopped. Export could have taken place in 1962, the next year, sometime, or never. On the tax date a strong probability of export existed, but there had been no commitment to a particular purchaser, and no delivery for export had taken place either to a common carrier or to a buyer or to a buyer's agent.''

Plaintiff claims that when a case is submitted on an agreed set of facts, without any evidence whatever, the findings of fact by the court should be disregarded. (*Crawford* v. *Imperial Irr. Dist.* (1927) 200 Cal. 318, 335 [253 P. 726].) And if the court makes a finding on a material issue contrary to the admission of the parties, a new trial should be granted. (*Henning* v. *Wuest* (1920) 48 Cal.App. 147 [191 P. 713].) Although the plaintiff states a generally correct rule, the court in *Capital National Bank* v. *Smith* (1944) 62 Cal.App.2d 328, 343 [144 P.2d 665], went on to say, ''However, we know of no rule which precludes the court from adopting findings upon issues not determined by a stipulation of facts.'' And, the case of *City of Los Angeles* v. *Gage* (1954) 127 Cal.App.2d 442, 450 [274 P.2d 34], held that it is proper for the court to make findings of fact where the stipulation contains evidentiary material only. Further, if the findings are supported by any substantial evidence, the judgment may not be disturbed.

(See also, *Taylor* v. *George* (1949) 34 Cal.2d 552 [212 P.2d 505].)

■ The case before this court was one in which much evidentiary matter, including exhibits, was set forth in the stipulation, and, therefore, findings by the court were proper. ■ Also, in all material matters, these findings were consistent with the stipulated facts. For example, the trial court's ultimate findings that: (1) all movement had stopped; (2) export could have taken place this year, next or never, and (3) that a strong probability of export existed, but there were no commitments to a particular purchaser, were ultimate findings naturally resulting from such stipulated evidentiary matters as: (1) the fact that there is a domestic market for prepared scrap in California, but once shipped to dockside, sale in domestic market is noncompetitive, (2) the fact that plaintiff secured an export license, (3) the fact that the 12,470 long tons were awaiting sale on the tax date, (3) the fact that the scrap which plaintiff intended to ship to The Gosho Company was, on the tax lien date, unsegregated from plaintiff's other, and then unsold, scrap, and, finally, (4) the fact that the contract of sale to the original Japanese buyers did not commit them to order any scrap at all and that, on the tax lien date, no order for shipment of any scrap from these buyers was on hand.

Since the ultimate findings as made by the trial court were consistent with the evidentiary stipulation,[1] and since the stipulated facts themselves compel the result reached, no error occurred.

## II

The principal issue in this case is whether the trial court erred in determining that, under the situation shown to have existed on the tax lien date, the scrap was not in the stream of foreign commerce and, thus, was not exempt from taxation under article I, section 10, clause 2 (the ''import-export'' clause) of the United States Constitution, and article XIII, section 1, of the Constitution of this state. ■ We con-

---

[1]Nothing is said in the stipulation about ''invoicing'' of the scrap, although the trial court's finding was that the scrap had not been invoiced on the lien date. However, it was stipulated that the scrap was, except for The Gosho Company order, all unsold on the lien date and that no scrap had been segregated for The Gosho Company. Under these circumstances, the finding was immaterial; an invoice, had one been prepared, covering an as yet uncertain quantity of unsegregated scrap would have added nothing to the status of the goods.

clude that the trial court properly held that the goods were not exempt from taxation by Los Angeles County.[2]

Plaintiff first argues that the trial court erroneously used the existence or nonexistence of a binding contract as its test for determining whether the goods acquired immunity under the export clause, and further, that the contract should not have been considered by the court at all. Although the judge in the trial court did consider the nonexistence of a binding contract as one factor in determining whether or not the goods were clothed with a probable certainty of export, the court did not, as plaintiff claims, use this as his basic test. ■ The test used appears in his memorandum opinion: "In order to qualify for the export exemption from taxation, goods must have started a continuous movement in export, and there must be probable certainty that the export will take place. Here neither requirement had been satisfied."

■ First of all, it was not incorrect to consider the contract as one relevant factor in this case. Since the contracts were included as exhibits, they were open to consideration by the court, and are a significant factor among many relevant factors useful in determining the probable certainty of export. ■ Secondly, the test as stated by the trial judge in the case at bench was correct. The court said in *Von Hamm-Young Co.* v. *City & County of San Francisco* (1947) 29 Cal.2d 798, 807 [178 P.2d 745, 171 A.L.R. 274], that the test for immunity from local taxation is "the certainty that the goods have been committed to a movement outside the state and will not be diverted into channels of local trade." Or as stated by another court, "It is the entrance of the articles into the export stream that marks the process of exportation. Then there is certainty that the goods are headed for their foreign destination and will not be diverted to domestic use. Nothing less will suffice." (*Empresa Siderurgica, S.A.* v. *County of Merced* (1949) 337 U.S. 154, 157 [69 S.Ct. 995, 997, 93 L.Ed. 1276, 1280], affirming 32 Cal.2d 68 [194 P.2d 527, 11 A.L.R.2d 934].) ■ Normally, goods are immune when they are shipped or entered with a common carrier for transportation to export or started on their journey. (*Empresa Siderurgica, S.A.* v. *County of Merced, supra,* and see also *Coe* v. *Errol* (1886) 116 U.S. 517 [6 S.Ct. 475, 29 L.Ed. 715].) However, if the certainty of a foreign destination is plain, levying a tax is improper even though there is no delivery to a common car-

---

[2]It is not contended that the tax liability was improperly computed if the goods were subject to tax at all.

rier. (See *Richfield Oil Corp.* v. *State Board of Equalization* (1946) 329 U.S. 69 [67 S.Ct. 156, 91 L.Ed. 80], where delivery was made not to a common carrier but to the hold of the purchaser's vessel from the vendor's tanks located at the docks.) ▮ However, the interior movement of property, destined for ultimate removal to another country, which is preliminary or preparatory in character, does not constitute such movement as to confer immunity. (See *Coe* v. *Errol, supra,* an interstate commerce case.) ▮ Intent to make goods an export is not enough to make those goods immune from taxation (*Empresa Siderurgica, S.A.* v. *County of Merced, supra*), and actual subsequent export of goods is not determinative as to their taxability as of the tax lien date. (*Joy Oil Co.* v. *State Tax Com.* (1949) 337 U.S. 286 [69 S.Ct. 1075, 93 L.Ed. 1366].)

▮ In the case at bench, the twofold test for immunity from taxes was not satisfied. The movement from the original purchase to the depot in Los Angeles was merely preparatory and not pursuant to any definite or assured plan to export. There was lacking the certainty that the goods were headed for a foreign destination. At the time of the original movement of the scrap, the original Japanese buyers had not validly contracted for the prepared scrap, and, as of that date, it was possible that those buyers would never order it. Although it was not competitive for Hugo Neu Corporation to divert the prepared scrap to a domestic market, a domestic market for the scrap did exist.

▮ As for the scrap contracted for by The Gosho Company, although a contract with The Gosho Company did exist prior to the taxing date, there was no movement or other acts, *after* the formation of that contract, or referable to it, such that immunity could have been conferred on that particular portion of the prepared scrap. On the tax lien date, plaintiff could have filled the Gosho order by shipping an as yet unidentified portion of the scrap on hand, or by buying and shipping other scrap meeting the specifications of the Gosho order.

Plaintiff objects that defendant has cited, in support of the contention that interior movement to a storage place is not part of the movement required to make the goods immune from local taxation, cases which deal with taxation of interstate commerce and not with foreign commerce, and that the interstate commerce cases are not here applicable. It is true

that, in *Richfield Oil Corp.* v. *State Board of Equalization* (1946) 329 U.S. 69, 75 [67 S.Ct. 156, 91 L.Ed. 80, 88], Mr. Justice Douglas said that the two constitutional provisions, while related, are not coterminous. However, in *Empresa Siderurgica, S.A.* v. *County of Merced, supra* (1949) 337 U.S. 154 [69 S.Ct. 995, 93 L.Ed. 1276], affirming (1948) 32 Cal.2d 68 [194 P.2d 527, 11 A.L.R.2d 934], a foreign export case, Mr. Justice Douglas cited with approval *Coe* v. *Errol, supra,* (1886) 116 U.S. 517 [6 S.Ct. 475, 29 L.Ed. 715], an interstate commerce case, and made the general test for immunity in the *Coe* case applicable to the cases involving foreign commerce. Whatever other difference there may be between the two provisions, we see no reason why the interstate commerce cases dealing with the issue of preliminary or preparatory movement should not also be valid in export cases.

Plaintiff cites several cases showing that a movement from one point in a state to another in that same state may be sufficient to make the goods immune from local taxation. What we have said in this opinion is not inconsistent with that general proposition nor with those cases. In *Texas & New Orleans R.R. Co.* v. *Sabine Tram Co.* (1913) 227 U.S. 111 [33 S.Ct. 229, 57 L.Ed. 442], it was held that lumber destined by the purchaser for export shipped by the seller under a local bill of lading from one point in Texas to a Texas port, unloaded without delay into slips or docks, and then into ships going to foreign ports, was exempt from state railroad commission tax. The two cases are clearly distinguishable. In the *Sabine* case, there was certainty of export, and the goods were stored for only a brief period of time. In the instant case, the storage period was indefinite because at the time of the arrival of the scrap at Terminal Island, the Japanese buyer had not yet placed orders and the Gosho contract was not yet entered into. Also, the court in the *Sabine* case held that the determining circumstance is that the shipment to *Sabine* was but a step in its transportation to its real and ultimate destination in foreign countries. That court also held that, whether the first transportation was independent and disconnected is also a relevant factor, and whether the shipments were constantly recurring was also significant. In the instance of the Hugo Neu Corporation, there could be no finding of ''continuity of transportation'' in a situation where goods may not be put into export at all.

In the case of *Carson Petroleum Co.* v. *Vial* (1929) 279 U.S. 95 [49 S.Ct. 292, 73 L.Ed. 626], also cited by plaintiff, the

court again used the continuity of transit as its crucial question. Oil was brought from one place to another and stored briefly before starting on its final journey. It is true that the exact destination of the oil was unknown, and the ships were loaded from bulk without separation. However, in the *Carson* case, the oil involved was a higher grade than that used in this country, thus making the diversion of that oil to domestic use highly improbable. Also, the companies in the *Carson* case *always* had orders from foreign buyers that were in excess of the oil stored in its storage depot at St. Rose, again making diversion to local use highly improbable. In the case of Hugo Neu Corporation, not only are we lacking the continuity of transportation, we lack sufficient certainty that the goods would have been exported at all.

Finally, the case of *Southern Pac. Terminal Co.* v. *Interstate Commerce Com.* (1911) 219 U.S. 498 [31 S.Ct. 279, 55 L.Ed. 310], cited by plaintiff, is distinguishable because there was no consumption of the products involved at Galveston, again making it highly improbable that the goods would be diverted to local use.

For the above stated reasons, the judgment is affirmed.

Files, P. J., and Jefferson, J., concurred.