CARL N. BYERS, Judge pro tempore.
 

 This case concerns the application of the Import-Export Clause of the United States Constitution to certain cedar logs being exported to Japan. Plaintiff, a foreign corporation, purchased the logs for export to Japan. The Assessor of Coos County assessed the logs as personal property subject to taxation as of January 1, 1976. The assessment was upheld by the Department of Revenue and plaintiff appeals from the department’s Order No. VL 78-127, dated April 6, 1978. The specific facts are as follows:
 

 The subject logs were harvested by their original owner, the Weyerhaeuser Company, and hauled to the Knutson Towboat Company log storage yard at Mil-lington, approximately three miles south of Coos Bay. The Millington yard is located on the Isthmus Slough, which is the means used to move logs from the yard to the bay for loading on ships. In the normal course of events, logs are stacked in decks on the land until a determination is made that they will be shipped. When logs are ordered or sold, the towboat company assembles the logs into bundles, sorted by species and length and bound by steel straps. The bundles are then dumped into the slough, where they are assembled into log rafts. The rafts are towed to various storage areas called "pockets” on the banks of the slough, usually close to the bay. When a ship arrives and is ready to receive the logs, the rafts are towed alongside the ship and loaded by means of ship booms and winches.
 

 The logs involved in this case were stored in two decks, identified as No. 88018 and No. 88518, totaling some 872,000 board feet. Weyerhaeuser Company sold
 
 *[99]
 
 the logs to plaintiff on December 10, 1975. Plaintiff notified the towboat company about December 15, 1975, that plaintiff intended to have a ship available early in January 1976 to ship the logs to Japan. On December 22, 1975, the towboat company started preparing the logs for shipment. Mr. Knutson, the owner of the towboat company, testified that it normally takes three weeks to one month to prepare a shipment of logs.
 

 As of January 1,1976, approximately two-thirds of deck No. 88018 had been bundled and dumped into the Isthmus Slough. The balance of that deck and all of deck No. 88518 appear to have been bundled and dumped into the water after January 1 and before the end of the workday on January 8,1976. The first log raft was moved to a storage pocket on the banks of the slough on January 3, 1976. The transporting ship "Montiron” apparently arrived somewhat later than first anticipated. In any case, the first raft was not towed to the ship for loading until January 9, 1976. Loading of the ship was completed within two to three days and the logs were then carried by the ship to Japan.
 

 The relevant portion of the U. S. Constitution, Art I, § 10, cl 2, provides, in part, that:
 

 "No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing it’s [sic] inspection Laws: * *
 

 The question raised by this general prohibition is "When does a commodity become an 'export’ and thus exempt from tax?” Prom one point of view, perhaps the most simple test is one of presence; that is, if the goods are in the state, they are taxable; if they are not present, they must be an exempt export. However, the United States Supreme Court early determined that a commodity may be an "export” while yet in the state. As expressed in the foundation case of
 
 Coe v. Errol,
 
 116 US 517, 525, 6 S Ct 475, 477, 29 L Ed 715, 718 (1886):
 

 
 *[100]
 
 "* * * There must be a point of time when they cease to be governed exclusively by the domestic law and begin to be governed and protected by the national law of commercial regulation, and that moment seems to us to be a legitimate one for this purpose, in which they commence their final movement for transportation from the State of their origin to that of their destination. * * *"
 
 *
 

 In light of the almost 100 years intervening, the case of
 
 Coe v. Errol has,
 
 remarkable application to the subject case. In that
 
 case, the
 
 plaintiff floated logs down the Androscoggin River from New Hampshire to Maine. The logs were assessed for taxation by the City of Errol, County of Coos, New Hampshire, while the logs were in storage on the riverbank awaiting an appropriate time to be dumped into the river. In finding that the logs were subject to taxation, the Supreme Court stated:
 

 «* * * When the products of the farm or the forest are collected and brought in from the surrounding country to a town or station serving as an
 
 entrepot
 
 for that particular region, whether on a river or a line of railroad, such products are not yet exports nor are they in process of exportation, nor is exportation begun until they are committed to the common carrier for transportation out of the State to the State of their destination or have started on their ultimate passage to that State. Until then it is reasonable to regard them as not only within the State of their origin, but as a part of the general mass of property of that State, * * (116 US at 525, 6 S Ct at 477, 29 L Ed at 718.)
 

 Thus, in each case, it is necessary to draw a line or pick a point in time at which certain goods or commodities are no longer a part of the general mass of property within the state but have "started on their ultimate passage.” Several tests have been applied by the court in making this determination, none of which alone is conclusive and together they are not entirely
 
 *[101]
 
 consistent. In the early case of
 
 Spalding & Bros. v. Edwards,
 
 262 US 66, 43 S Ct 485, 67 L Ed 865 (1923), the court relied upon the "delivery to a common carrier” test in determining that baseball bats in the hands of the common carrier in the state but not yet loaded on a ship for Argentina were "exports.” However, commitment to a common carrier alone is not conclusive since, in
 
 Empresa Siderurgica, S. A. v. Merced,
 
 337 US 154, 69 S Ct 995, 93 L Ed 1276 (1949), the court held that property in the hands of a common carrier was nevertheless taxable. In that case, the common carrier was dismantling a cement plant for shipment to a foreign country. Twelve percent of the plant had been loaded on railroad cars and moved, which portion was held exempt as having started the process of exportation. As to the remainder of the plant, however, the court found that, although in the process of being prepared for exportation, the property had not started the process. Speaking for the court, Justice Douglas said:
 

 "So in this case it is not enough that on the tax date there was a purpose and plan to export this property. Nor is it sufficient that in due course that plan was fully executed. Part of the plant that is taxed was dismantled, but it had not been delivered to any carrier for export or otherwise started on its journey on the tax date. * * * But that prospect, no matter how bright, does not start the process of exportation. On the tax date the movement to foreign shores had neither started nor been committed.” (337 US at 157, 69 S Ct at 997, 93 L Ed at 1280.)
 

 In the case of
 
 Richfield Oil Corp. v. State Board of Eq.,
 
 329 US 69, 67 S Ct 156, 91 L Ed 80 (1946), the court held that movement had started, although no common carrier was involved. Oil was sold by Rich-field to the government of New Zealand and had been pumped by Richfield into the tanks of a New Zealand government ship. In determining that the oil was an export and not subject to the sedes and use tax of California, the court found that the oil had started the process of exportation (apparently in the movement
 
 *[102]
 
 from Richfield’s oil tanks into the hold of New Zea-land’s ship). The court emphasized the certainty that the oil would be exported and not diverted to domestic markets.
 

 While "certainty of export” is another test to be applied, it is not conclusive. This is illustrated by the two most recent cases cited by the parties. In
 
 Kosydar v. National Cash Register Co.,
 
 417 US 62, 94 S Ct 2108, 40 L Ed2d 660 (1974), the court held that, even if goods are irrevocably committed to export, there is no immunity from taxation until they actually start the process. There, the National Cash Register Co. manufactured business machines for export. The machines were built to the specifications of the foreign purchasers and were not adaptable for use domestically. After manufacture, the machines were crated, readied for shipment and then stored in a warehouse until actually exported. Likewise, in
 
 Sumitomo Forestry Co., Ltd. of Japan v. Thurston Cty, Wash.,
 
 504 F2d 604 (9th Cir 1974),
 
 cert denied,
 
 423 US 831 (1975),
 
 rehearing denied,
 
 423 US 1081 (1976), the foreign corporation purchased logs for export to Japan. The logs were moved to docks in the Port of Olympia and stored there, awaiting arrival of a ship. The purchaser, Sumitomo, sold no logs domestically and it was reasonably certain that the logs would be exported. However, the Ninth Circuit Court, in light of
 
 Kosydar,
 
 held that such logs were taxable since they had not been committed to a common carrier and they were not on a ship.
 

 Thus, we are left with various judicial attempts to describe that moment when those concerned can report that the goods "are on their way,” meaning that they have started their final movement. The Supreme Court appears to use delivery to a common carrier as a test because of the loss of control over the goods and the fact that even goods sitting on a loading dock at a railroad station or truck depot appear to be separate
 
 *[103]
 
 from the general mass of goods. In these circumstances, delivery to a common carrier combines an element of certainty with discernible movement.
 

 If these be the prime considerations of the "common carrier test,” other considerations require close scrutiny of application of the test. As in
 
 Empresa Siderurgica, supra,
 
 many kinds of commodities are handled by common carriers without any expectation or intent of exportation. For example, it is common knowledge that many logs are hauled out of the woods by independent truckers who are common carriers, yet many of such logs are used for domestic purposes. On the other hand, it does not appear to be reasonable to apply an "ultimate carrier test” since the nature of the goods or the practice of the industry may require handling of exports by more than one carrier.
 
 Multnomah County v. Dant & Russell,
 
 158 Or 350, 75 P2d 986 (1938).
 

 Here, plaintiff argues that the subject logs were committed to a "common carrier” and thus had started on their journey. The evidence tends to support plaintiff’s contention in this regard since Mr. Knutson testified that virtually all cedar logs are exported and his company handles most, if not all, of the logs being exported out of Coos Bay. However, the evidence also indicated that Knutson Towboat Company handles logs for many parties and that delivery to that company is not necessarily starting a process of exportation.
 

 In reviewing the case of
 
 Coe v. Errol, supra,
 
 the court is impressed with this language:
 

 "* * * But this movement does not begin until the articles have been shipped or started for transportation from the one State to the other. The carrying of them in carts or other vehicles or even floating them to the depot where the journey is to commence is no part of that journey. That is all preliminary work, performed for the purpose of putting the property in a state of preparation and readiness for transportation. * * * Carrying it from the farm or the forest to the depot is only an interior
 
 *[104]
 
 movement of the property, entirely within the State, for the purpose, it is true, but only for the purpose, of putting it into a course of exportation; it is no part of the exportation itself. Until shipped or started on its final journey out of the State its exportation is a matter altogether
 
 in fieri,
 
 and not at all a fixed and certain thing.” (116 US at 528, 6 S Ct at 479, 29 L Ed at 719.)
 

 Although the towboat company here may be a common carrier, the bundling of logs, their compilation into rafts, and movement to storage areas were, in the opinion of the court, all in preparation for the exportation of such logs and not the beginning of that process. The court believes that the dominant character of such physical movement as did occur in the handling, bundling and rafting of the logs is in preparation only. While stored in rafts on the banks of the slough, as are other "domestic” logs, such logs remain too closely identified with the general mass of logs stored and handled in a like manner. Further, Mr. Knutson testified that owners of such logs sometimes have them removed from the water, rebundled and resorted to meet their own individual needs. This possibility of diversion from exportation erodes the element of certainty which must be present.
 

 As in
 
 Empresa Siderurgica, supra,
 
 the initial common carrier here was preparing the goods for shipment. Under the circumstances present, it was the oceangoing vessel which started the logs on their "final” continuous journey out of the state. If one had to pick a moment in time, it might be when the boom of the ship lifted the log out of the water and onto the ship or it might be when the ship’s screw’s first begin to turn and move the ship toward Japan. Such more precise determinations are not required here, however, since, on the assessment date in question, none of the logs had been towed to the ship. The logs in the raft which was closest to the ship were, in the opinion of the court, merely in storage, much like the logs in
 
 Sumitomo Forestry Co., supra,
 
 were in storage.
 

 
 *[105]
 
 The court, therefore, holds that the subject logs had not started the process of exportation and were therefore not exempt from taxation under the Import-Export Clause of the United States Constitution. The Opinion and Order of the Department of Revenue, No. VL 78-127, is hereby sustained.
 

 Costs to neither party.
 

 *
 

 Although
 
 Coe v. Errol,
 
 116 US 517, 6 S Ct 475, 29 L Ed 715 (1886), dealt with when goods enter interstate commerce, the same test is applied in determining when goods become an export or start the process of exportation.
 
 Richfield Oil Corp. v. State Board of Eq.,
 
 329 US 69, 67 S Ct 156, 91 L Ed 80 (1946).