]No. 34113. Department One. July 11, 1957.[

EARDLEY FISHERIES COMPANY, INC., *Appellant*, v. THE CITY OF SEATTLE, *Respondent.*[1]

[1]Reported in 314 P. (2d) 393.

*Ryan, Askren & Mathewson,* for appellant.

*A. C. Van Soelen* and *C. V. Hoard,* for respondent.

OTT, J.—This is an appeal from a judgment of the superior court which denied a refund to appellant of the business and occupation tax paid under protest to the city of Seattle.

The facts are substantially as follows: The United States government, through the office of the quartermaster general of the army, issued an invitation to bid to supply the army with specified frozen sea food for export. The appellant, Eardley Fisheries Company, Inc., a Washington corporation having its principal place of business at Seattle, was notified that it was the successful bidder. The government's purchase orders provided that the commodities purchased were " 'FOR EXPORT,' " and were to be packed, marked, and delivered in conformity with its requirements for export purposes, and that the government would accept deliveries at designated cold storage depots located within the state of Washington. The contracts required that the perishable commodities be kept under refrigeration by the seller until delivery.

Upon receipt by the purchaser, the commodities were further processed by quick-freezing at zero temperature, in preparation for export shipment. Upon requisition by the overseas units of the United States, and the arrival of vessels having sufficient refrigeration facilities, the sea food was transported to overseas bases and installations of the United States.

These commodities purchased by the United States were kept in storage and stock-piled for variable periods of time (from ninety to one hundred twenty days), awaiting shipment overseas. Local cold storage and transportation abroad were furnished by the purchaser. The goods with which we are concerned were all shipped overseas in accordance with the intention of both contracting parties.

Under ordinance No. 72630, the city of Seattle imposed a business tax based upon the gross sales of the appellant in the above transactions.

On appeal, the appellant contends that the application of this taxing ordinance was in violation of Art. I, § 10, clause 2, of the United States constitution, which provides in part as follows:

"No state shall, without the consent of the congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws: . . ."

The sole issue on appeal is whether or not the tax here imposed constituted a tax upon exports, repugnant to the constitution. (The exception with reference to execution of inspection laws is not urged by either party as being applicable to this case.)

The transactions between the appellant and the United States government began and terminated within this state. The seller's responsibility with reference to the commodities ended upon delivery to the purchaser in accordance with the terms of the contracts. The invitation to bid, the bid, the acceptance of that bid, the delivery and acceptance of the goods, and the passage of title to the commodities, all took place within the state of Washington.

By this process, had the goods entered into the stream of exportation, thereby rendering them immune from local taxation?

In the determination of this issue, we follow the decisions of the United States supreme court. These decisions have announced certain rules as a guide for our determination of this question.

■ The fact that the parties intended that these goods would be exported, and the fact that they were exported, are not decisive. As was said in *Empresa Siderurgica, S. A. v. County of Merced*, 337 U. S. 154, 157, 93 L. Ed. 1276, 69 S. Ct. 995 (1949):

"So in this case it is not enough that on the tax date there was a purpose and plan to export this property. Nor is it sufficient that in due course that plan was fully executed."

See, also, *Joy Oil Co. v. State Tax Comm.*, 337 U. S. 286, 93 L. Ed. 1366, 69 S. Ct. 1075 (1949).

■ The carrying of the product to a depot where the journey is to commence is not a part of the export journey. *Coe v. Errol,* 116 U. S. 517, 29 L. Ed. 715, 6 S. Ct. 475 (1886).

There must be some action on the part of the seller which irrevocably places the goods in their final movement out of the country. *Cornell v. Coyne,* 192 U. S. 418, 48 L. Ed. 504, 24 S. Ct. 383 (1904).

■ Further, there must be a *certainty* at the time the tax accrues that the goods will be exported. This certainty can be established by one of two methods:

(1) Where there is a delivery by the seller to a carrier for shipment abroad. *Richfield Oil Corp. v. State Board,* 329 U. S. 69, 91 L. Ed. 80, 67 S. Ct. 156 (1946); *A. G. Spalding & Bros. v. Edwards,* 262 U. S. 66, 67 L. Ed. 865, 43 S. Ct. 485 (1923). As was said by Justice Douglas in *Empresa Siderurgica v. County of Merced, supra* [p. 156]:

" ' . . . goods do not cease to be part of the general mass of property in the State, subject, as such, to its jurisdiction, and to taxation in the usual way, until they have been shipped, or entered with a common carrier for transportation to another State, or have been started upon such transportation in a continuous route or journey.' *Coe v. Errol,* 116 U. S. 517, 527. That test was fashioned to determine the validity under the Commerce Clause of a nondiscriminatory state tax. But as we noted in *Richfield Oil Corp. v. State Board,* 329 U. S. 69, 79, it is equally applicable to cases arising either under Art. I, § 10, Cl. 2 (the Import-Export Clause) or under Art. I, § 9, Cl. 5, which prohibits Congress from laying any tax on 'Articles exported from any State.'

"Under that test it is not enough that there is an intent to export, or a plan which contemplates exportation, or an integrated series of events which will end with it. See *Turpin v. Burgess,* 117 U. S. 504; *Cornell v. Coyne,* 192 U. S. 418. The tax immunity runs to the process of exportation and the transactions and documents embraced in it. *Fairbank v. United States,* 181 U. S. 283; *United States v. Hvoslef,* 237 U. S. 1; *Thames & Mersey Ins. Co. v. United States,* 237 U. S. 19. Delivery of packages to an exporting carrier for shipment abroad (*Spalding & Bros. v. Edwards,* 262 U. S. 66) and the delivery of oil into the hold of the ship furnished by the foreign purchaser to carry the oil abroad (*Richfield Oil Corp. v. State Board, supra*) have been held

sufficient. It is the entrance of the articles into the export stream that marks the start of the process of exportation. *Then there is certainty that the goods are headed for their foreign destination and will not be diverted to domestic use. Nothing less will suffice.*" (Italics ours.)

(2) The character of the commodity may also establish certainty that it will enter the stream of foreign commerce. Where, for all practical purposes, the commodities could be used only abroad and could serve no domestic purpose, it could then be said that the goods were irretrievably committed to export. As was said by Justice Frankfurter in *Joy Oil Co. v. State Tax Comm., supra* [p. 288]:

"While in storage, the gasoline might have been diverted to domestic markets without disruption of any existing arrangement for its transshipment and without even breach of any contractual commitment to a foreign purchaser. *Neither the character of the property nor any event equivalent to its redelivery to a common carrier made export certain for all practical purposes.* See *Richfield Oil Corp. v. State Board*, 329 U. S. 69, 82.

"The Export-Import Clause was meant to confer immunity from local taxation upon property being exported, not to relieve property eventually to be exported from its share of the cost of local services. See *Coe v. Errol*, 116 U. S. 517, 527-28." (Italics ours.)

Appellant strongly relies upon two Federal authorities:

(1) *A. G. Spalding & Bros. v. Edwards, supra*, in which Justice Holmes said [p. 69]:

"The fact that further acts were to be done before the goods would get to sea does not matter so long as they were only the regular steps to the contemplated result. . . . Neither does it matter that the title was in Scholtz & Co. and that theoretically they might change their mind and retain the bats and balls for their own use. There was not the slightest probability of any such change and it did not occur. . . . Theoretical possibilities may be left out of account."

(2) *Richfield Oil Corp. v. State Board, supra*. This opinion was written by Justice Douglas, who was also the author of the *Empresa Siderurgica* case, *supra*, and, in the latter case, both the *Spalding* and the *Richfield* cases were distinguished as instances where the seller delivered the com-

modity aboard ships destined for foreign ports. Under such circumstances, the court held that the certainty of export test had been met.

The Federal cases relied upon by appellant are distinguished by the interpretation placed thereon by a later decision of the same court.

The appellant also cites a case from our own jurisdiction, *Alaska S. S. Co. v. State*, 31 Wn. (2d) 328, 196 P. (2d) 1001 (1948). In that case, this court determined that a steamship sold to a foreign purchaser was its own "carrier," and that there had been an actual *commitment* of the steamship to foreign service before it left Washington waters, by the change of its maritime registry to that of a foreign vessel and by placing a foreign flag aboard while it was still moored in a Washington port. Our decision in the *Alaska Steamship* case meets the test of certainty as announced by the most recent decisions of the United States supreme court on this question.

These cases do not sustain appellant's position.

█ Applying the above rules to the instant case, the certainty of export of the commodities was not established by appellant. At the time the tax accrued, the delivery had been made to local storage depots, and not to carriers destined for abroad. There was a possibility, within the purview of the rules, that these goods might find their way into domestic commerce. The goods were of a character that made their domestic use possible. This is supported by the court's finding, in the instant case, that similar items, so packed, stored, and purchased from appellant, were domestically consumed.

We conclude that, at the time of delivery of the sea food by appellant and the consummation of the sale to the United States government, the goods in question were not in the stream of export, as that term is defined in the above-cited cases.

The judgment is affirmed.

HILL, C. J., MALLERY, FINLEY, and WEAVER, JJ., concur.