[No. 42791.    En Banc.    October 10, 1974.]

THE CARRINGTON COMPANY, *Respondent*, v. THE DEPART-
MENT OF REVENUE, *Appellant*.

*Slade Gorton, Attorney General, Timothy R. Malone, Senior Assistant,* and *Henry W. Wager* and *William Dexter, Assistants,* for appellant.

*Ashley, Foster, Pepper & Riveria* and *David W. Sandell,* for respondent.

BRACHTENBACH, J.—The states are prohibited from levying any impost or duty upon imports or exports. U.S. Const. art. 1, § 10.

Our business and occupation tax law accommodates this restraint by excluding from that tax amounts derived from business which the State is prohibited from taxing under the United States Constitution. RCW 82.04.430 (6).

Here we are concerned with the correctness of the trial court's holding that plaintiff's sales, as described later, involved exports and therefore were free from the state business and occupation tax on retailing as imposed by RCW 82.04.250. Plaintiff seeks a refund, pursuant to RCW 82.32.180, of the tax assessment made by the State.

Before considering the facts, we shall set out the principles which necessarily guide us in determining whether this tax does what the constitution prohibits.

■ At the outset we note the case is somewhat unique in that the United States Government itself is the purchaser. While most export cases involve a foreign purchaser, there is no authority that such is an implied requirement of the constitutional provision. Indeed it has been held that the United States, as a buyer for export, is entitled to the benefit of the prohibition against taxes on exports. *Union Oil Co. v. Los Angeles,* 227 Cal. App. 2d 608, 38 Cal. Rptr. 923 (1964).

■ To enjoy the constitutional protection as an export, goods must have entered the export stream with certainty of a foreign destination. Neither intent to export nor the ultimate fact of actual exportation alone is sufficient to invoke the immunity. *Richfield Oil Corp. v. State Bd. of Equalization,* 329 U.S. 69, 91 L. Ed. 80, 67 S. Ct. 156 (1946); *Empresa Siderurgica, S.A. v. County of Merced,* 337 U.S. 154, 93 L. Ed. 1276, 69 S. Ct. 995 (1949).

It must be recognized that the prohibition is absolute except for the very narrow exception of allowing the impo-

sition of inspection fees. *Richfield Oil Corp. v. State Bd. of Equalization, supra.*

The United States Supreme Court cases mandate that exports be given liberal protection. *A.G. Spalding & Bros. v. Edwards,* 262 U.S. 66, 67 L. Ed. 865, 43 S. Ct. 485 (1923), so states; and *Thames & Mersey Marine Ins. Co. v. United States,* 237 U.S. 19, 59 L. Ed. 821, 35 S. Ct. 496 (1915), illustrates application of a liberal approach by holding that the protective umbrella is great enough to prohibit a stamp tax on insurance policies insuring the exported goods.

■ Entry into the export stream must be the start of a continuity of movement. *Carson Petroleum Co. v. Vial,* 279 U.S. 95, 73 L. Ed. 626, 49 S. Ct. 292 (1929). Yet the journey may be interrupted if the purpose of the interruption is "reasonable and in furtherance of the intended transportation." *Hughes Bros. Timber Co. v. Minnesota,* 272 U.S. 469, 476, 71 L. Ed. 359, 47 S. Ct. 170 (1926). The point has been otherwise stated as allowing interruption to "promote the safe or convenient transit" of the goods. *Champlain Realty Co. v. Brattleboro,* 260 U.S. 366, 376, 67 L. Ed. 309, 43 S. Ct. 146, 25 A.L.R. 1195 (1922). In application the following situations have been deemed to be permissible interruptions: (1) holding of logs in a boom in a river to await subsidence of high water, *Champlain Realty Co. v. Brattleboro, supra;* (2) shipment to an independent export packer for preparation for ocean travel, *Gough Indus., Inc. v. State Bd. of Equalization,* 51 Cal. 2d 746, 336 P.2d 161, *cert. denied,* 359 U.S. 1011, 3 L. Ed. 2d 1037, 79 S. Ct. 1151 (1959); (3) accumulation and storage for convenient and efficient loading of ships. *Cargill of Cal., Inc. v. County of Yolo,* 26 Cal. App. 3d 704, 103 Cal. Rptr. 257 (1972); *Carson Petroleum Co. v. Vial, supra.* Some of these cited cases involved the commerce clause, but the rationale is pertinent here.

■■ It was contended in a number of these cases, as does the State here, that the owner of the goods might divert them from the export stream since they are not irrevocably bound overseas until they are on board the

ship. In *A.G. Spalding & Bros. v. Edwards, supra,* a New York company purchased goods for a foreign company. A tax on the manufacturer of the goods was struck down and Mr. Justice Holmes stated at page 69:

> The fact that further acts were to be done before the goods would get to sea does not matter so long as they were only the regular steps to the contemplated result. . . . Neither does it matter that the title was in [the foreign buyer's agent] and that theoretically they might change their mind and retain the bats and balls for their own use. . . . Theoretical possibilities may be left out of account.

*Hughes Bros. Timber Co. v. Minnesota, supra,* was a commerce clause case, but the court said at page 475:

> The character of the shipment in such a case [when the owner retains control of the transportation and can divert] depends upon all the evidential circumstances looking to what the owner has done in the preparation for the journey and in carrying it out. The mere power of the owner to divert the shipment already started does not take it out of interstate commerce, if the other facts show that the journey has already begun in good faith and temporary interruption of the passage is reasonable and in furtherance of the intended transportation . . .

Turning to the facts, we find that the plaintiff was the successful bidder to supply parts and equipment of a specified make to the General Services Administration of the United States (GSA). From the invitation to bid to the accomplished fact, all such items were destined for and delivered to military installations in Southeast Asia, Korea and Japan. All sales in the relevant period of 1967-71 were pursuant to individual GSA purchase orders, each of which identified a particular part, a named overseas recipient and a specific overseas destination. Pursuant to the purchase order requirements, the shipments were trucked from Seattle to GSA's Tacoma packing facility. The Tacoma facility had been established for the sole purpose of packing items for overseas shipment to United States military establishments. On the average, materials were at the packing oper-

ation for only 7 or 8 days before being loaded on a ship or airlifted out. During that time they were inspected for compliance with specifications and packaged for overseas shipment.

From these facts, the court concluded that when the items were loaded on the trucks in Seattle it was certain that they were destined for export, that they then entered the export stream and that the packing in Tacoma was not a break in the stream of export, but in furtherance of it. We agree. The bid itself specified that the goods were for export. The purchase orders identified the recipient overseas agency and the foreign destination. The delivery, without exception, was to a facility designed solely to package the goods for overseas shipment. Under these facts it is conclusive that there was a meshing of the certainty of export with the commitment to and actual commencement of transportation in the export stream. There was no diversion and the possibility of diversion was merely hypothetical and remote. Realities and probabilities are controlling, not theoretical possibilities.

The State relies on our decision in *Eardley Fisheries Co. v. Seattle*, 50 Wn.2d 566, 314 P.2d 393 (1957). That case enunciates principles in accord with our decision here, but the facts distinguish it. The goods in *Eardley* were frozen seafood held by the purchaser in cold storage depots for periods as long as 120 days after the government accepted delivery. Domestic use was obvious and found to exist. The tax accrued upon delivery to the local storage. The court correctly held that at the time of sale, delivery to the storage, there was no certainty of export of identifiable goods nor entry at that point into the export stream.

Finally the State's own administrative rule, WAC 458-20-193C(3) acknowledges that something short of delivery at dockside will constitute entry into the export stream. It states that it is sufficient if there is delivery to "other vehicles of transportation under circumstances where it is clear the goods will be taken to a foreign destination."

Those are the circumstances here; it is clear and the trial court was correct.

The judgment is affirmed.

FINLEY, STAFFORD, WRIGHT, and UTTER, JJ., concur.

HALE, C.J. (dissenting)—The court, I think, fails to make that fundamental distinction upon which nearly all state revenue depends: The difference between a thing to be taxed and the business of making, transporting and selling it; the difference between taxing the privilege of retailing and taxing the goods themselves. There are other differences, too, but unless that primary distinction is observed by the courts, a major segment of business, commercial and financial activity within the state will be sheltered from business and occupation taxes. I would preserve that distinction in interpreting the revenue laws and, therefore, dissent.

The Carrington Company engages in the business of selling and distributing construction equipment, farm machinery and replacement parts. In accordance with a governmental publicly-called bid and award, Carrington entered into a contract with the United States Government through the government's General Services Administration (GSA) to sell numerous pieces of construction machinery which the government intended to supply to American military establishments in Southeast Asia, Korea and Japan.

At the time, this country had long been and was still engaged in a bloody conflict in Vietnam, suffering enormous casualties upon the battlefield and in the air, expending its resources in astronomical proportions without the legal and constitutional sanction of a declaration of war by the Congress of the United States. Neither party to this suit has seen fit to raise the point that the machinery in issue here had been purchased for and was consigned to be used in the prosecution of an undeclared and presumptively unconstitutional war of long duration. The main point to this is that, in the call for bids and the contract to purchase, the

executive branch (GSA) did not purport to act pursuant to a declaration of war by the Congress (U.S. Const. art. 1, § 8, clause 10); nor assert freedom from state taxation on behalf of its suppliers as a war-waging agency; nor claim any immunities for and on behalf of a sovereign that vendors of machinery, during and for the prosecution of the Vietnam conflict, be exempt from the State's retailing tax. The record shows no general or specific claim whatever of exemption by the United States.

All business activity connected with the bidding, the sale and the delivery of heavy construction equipment to the General Services Administration, so far as the United States was concerned, therefore, contemplated that all state and local taxes ordinarily applicable to the sale and delivery of machinery would likewise apply to the performance of the Carrington Company's contract. The exemption claimed here that the sale constituted an export as between the parties must, therefore, be deemed a unilateral afterthought generated by the Carrington Company and not based on any claim by the United States, for the federal government in calling for bids did not assert any sovereign exemption from state and local taxation on behalf of its suppliers.

The business activity which the State here seeks to tax under RCW 82.04.250 was the retailing of heavy construction equipment by the Carrington Company to the General Services Administration of the United States. In performing its contract to sell this equipment, the Carrington Company would receive from the GSA a specific purchase order; it would fill the order by packing the machinery for transportation to the GSA depot and then truck it to the GSA packing facility in Tacoma, a facility controlled and operated by the United States. Title to and ownership in the equipment passed to the United States on delivery. Upon receiving the machines, GSA repacked them at its Tacoma facility for overseas transportation, loaded them onto ships or delivered them to airports and, with a few

exceptions, sent them abroad. After arrival at the GSA facility in Tacoma, but prior to shipment either by air or sea, the equipment remained at the GSA facility for about 15 to 18 days. As earlier noted, title passed to the GSA not later than delivery. After taking delivery of the machines, GSA could do with them as it desired, either store them, ship them to another domestic port, ship them to its own or a foreign entity abroad.

Whatever the parties may have intended or contemplated as to the ultimate disposition of the machinery, their views would have little to do with fixing taxability because the goods were not irrevocably in foreign commerce until loaded and the ship or airplane carrying them had cleared for a foreign port. The GSA facility to which Carrington delivered the equipment and where it was repacked for overseas shipment was at all times free to change its destination. After repacking at its facility, GSA customarily delivered the equipment to the Port of Tacoma dock to be there loaded onto a ship for overseas transport or sent it to either McChord Air Force Base in Tacoma or Travis Air Force Base in California for shipment by air. As previously noted, however, a few of the pieces of machinery during the period relevant here, January 1, 1967, to March 31, 1971, were not sent overseas.

The court declares the machinery and equipment which Carrington sold to GSA to be exports and, therefore, exempt under U.S. Const. art. 1, § 10, which bars the imposition of local taxes on exports and imports:

> No state shall, without the consent of the congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws: and the net produce of all duties and imposts, laid by any state on imports or exports, shall be for the use of the treasury of the United States; and all such laws shall be subject to the revision and control of the congress.

In construing the constitutions, the courts, I think, are bound to point out some direct connection between the language of the constitution and the rule announced. They

are not free to ascribe to the constitutions whatever meaning they choose at the moment to give them, nor to revise the constitution under the guise of interpretation. Accordingly, in determining whether given commodities or the commercial processes related to them constitute "exports" within the meaning of the constitution, first resort should be to the language of the constitution. If this is done here, any reference to the business of selling at wholesale or retail or the business of exporting is conspicuously absent for the tax immunity claimed here is narrowly stated by the word "exports." The constitution does not say that the state may lay no impost or duty on goods manufactured for export, or in transit for export, or consigned to the export trade, or those moving in the stream of interstate or foreign commerce. All of these concepts are excluded by the precise and limited language and the use of two definitive nouns instead of phrases, *i.e., imports* and *exports.*

Nor should the courts allow the parties to the transaction to determine taxability by agreement, either tacit, implied or declared. Whether the goods are exports as a matter of law or fact should not depend upon and the court should reject a rationale that the parties, or either of them, to a business transaction can determine the taxable status of goods, activities or business merely by labeling the goods or the activities affecting them or by declaring their intentions about either. Where there is a dispute in the facts, or even if the parties agree to the facts when inferences of taxability contrary to their conclusions can be reasonably drawn, the court in its fact-finding and conclusionary powers may differ markedly from the parties in its finding of fact and conclusion of law as to the taxable events concerning the goods, activity or business.

In this case, the facts are not in dispute. The conclusions to be drawn from them, however, are, I think, a question of law. If the *sale* of these machinery items constitutes an export, as distinguished from the business of selling goods ultimately intended for overseas shipment, then it follows

that nearly all goods and items of commerce consigned for overseas shipment once documented for overseas consignment must move in commerce free not only of ad valorem taxes in transit but free of the impingement of any tax and excise imposed upon the business of rendering any services whatever affecting such item of commerce.

Thus, under the court's decision, for example, if a Japanese corporation, or any foreign corporation, should buy standing timber in the state of Washington, and ticket it irrevocably for ultimate shipment to Japan, it would, under this court's decision, pass to the ports as an export completely free of all state excises and ad valorem taxes. All of the business and manufacturing activities affecting the purchasing, cutting, logging, hauling, sawing, planing, storing, and the many other taxable activities concerning the logs and the lumber derived from them would be free of taxes now imposed by the State's business and occupation tax. Or, if standing timber were purchased by a foreign corporation, irrevocably marked by the parties for export and by agreement manufactured into plywood and irrevocably earmarked for sale and delivery to the foreign purchaser overseas, all of the business and manufacturing activities related to these transactions would likewise be exempt from state excises under the constitutional bar against taxing exports.

That the constitution does not intend to exempt goods from state and local taxes is apparent in the use of the narrow and precise employment of the noun "export," a word which must be taken to mean nothing more than that, until the goods reach that inevitable point where they are no longer a part of the mass of goods within the state, they are not "exports." The plan, design, intent and purpose of the seller and buyer or either of them that the goods will ultimately be shipped overseas, even if they are finally so transported is, therefore, not the test of taxability nor enough to confer a tax immunity upon the multifarious business activities of financing, growing, fabricating, shap-

ing, manufacturing, trucking, warehousing, wholesaling and retailing them which take place while the goods in their various stages of development are a part of the mass of property within the state. Only when the *goods* have achieved the final and irrevocable entry into the export stream do they become exports, free of local and state taxes. The intangible activity of selling the goods should not be mistaken for the tangibles themselves.

Putting the goods—as the expression goes—into the export stream, does not suffice to make them exports; they do not become exports until irrevocably—and as between the parties—and irretrievably committed to foreign shipment, for the intentions of those claiming a property or possessory right are of little moment in determining the status of the property for taxation purposes. This principle, I think, emerged in *Empresa Siderurgica, S.A. v. County of Merced*, 337 U.S. 154, 93 L. Ed. 1276, 69 S. Ct. 995 (1949), a decision delivered upon this very subject some 3 years after *Richfield Oil Corp. v. State Bd. of Equalization*, 329 U.S. 69, 91 L. Ed. 80, 67 S. Ct. 156 (1946), upon which this court relies so heavily now.

The Washington State Department of Revenue recognized this rigid standard of irrevocable export in specifying:

> In all circumstances there must be (a) *a certainty of export and* (b) *the process of export must have started.*

(Italics mine.) WAC 458-20-193C. However, the standard may be phrased then, until the moment when the goods are irrevocably committed to be exported, they are not exports. A clear example of exports would be goods consigned to an overseas destination and stowed on board a ship which has cleared the port for foreign destination. Although one may conjure up an earlier point of irrevocability, until it has been reached the goods remain a part of the mass of property within the state in which the port is situated. The constitution does not before that point relieve either the goods or those doing business with respect to them of their fair share of the taxes assessed upon them and the business

activities related to them. A contrary rule, one which permits the goods to be designated as exports at a time prior to actual export, for example, at the time the owner, seller, or buyer has intended them for export or agrees that they will be exported, must necessarily operate to immunize the business activities affecting major quantities of goods, wares and merchandise from state taxation not only at dockside or at the airport but at various earlier points in their development—and conceivably running back to a point when the raw materials are removed from the earth and continuing throughout all subsequent extracting, refining, manufacturing, transporting, wholesaling and retailing processes. That most or even all of the goods are ultimately exported does not make them exports while they are within the state and a part of the mass of property in the state.

An early statement of controlling principles is found in *Coe v. Errol*, 116 U.S. 517, 525, 528, 29 L. Ed. 715, 6 S. Ct. 475 (1886):

When the products of the farm or the forest are collected and brought in from the surrounding country to a town or station serving as an entrepot for that particular region, whether on a river or a line of railroad, such products are not yet exports, nor are they in process of exportation, nor is exportation begun until they are committed to the common carrier for transportation out of the State to the State of their destination, or have started on their ultimate passage to that State. Until then it is reasonable to regard them as not only within the State of their origin, but as a part of the general mass of property of that State, subject to its jurisdiction, and liable to taxation there, if not taxed by reason of their being intended for exportation, but taxed without any discrimination, in the usual way and manner in which such property is taxed in the State.

. . . Though intended for exportation, they may never be exported; the owner has a perfect right to change his mind; and until actually put in motion, for some place out of the State, or committed to the custody of a carrier for transportation to such place, why may they not be

> regarded as still remaining a part of the general mass of property in the State? If assessed in an exceptional time or manner, because of their anticipated departure, they might well be considered as taxed by reason of their exportation or intended exportation; but if assessed in the usual way, when not under motion or shipment, we do not see why the assessment may not be valid and binding.

and

> Carrying it from the farm, or the forest, to the depot, is only an interior movement of the property, entirely within the State, for the purpose, it is true, but only for the purpose, of putting it into a course of exportation; it is no part of the exportation itself. Until shipped or started on its final journey out of the State its exportation is a matter altogether *in fieri*, and not at all a fixed and certain thing.

The Supreme Court of the United States affirmed the *Coe* case in *Turpin v. Burgess*, 117 U.S. 504, 507, 29 L. Ed. 988, 6 S. Ct. 835 (1886), but affirmed too the proposition that the intention of the parties to export the goods counts for little:

> How can the officers of the United States, or of the State, know that goods apparently part of the general mass, and not in course of exportation, will ever be exported? Will the mere word of the owner that they are intended for exportation make them exports? This cannot for a moment be contended. It would not be true, and would lead to the greatest frauds.

Eighteen years later, the court again held that the goods are not exports until the seller has taken action to irrevocably place the goods in their final movement out of the country. *Cornell v. Coyne*, 192 U.S. 418, 48 L. Ed. 504, 24 S. Ct. 383 (1904). It follows, therefore, that anything short of the final and irrevocable commitment to export does not suffice to remove the goods from the mass of taxable property within the state.

In the instant case, from the time the contract to sell was entered into until transfer of ownership with delivery to

the GSA at its facility, the machinery was a part of the mass of property within the state, and remained so thereafter for several later phases not relevant to the issue of taxability. All of the transactions respecting the machinery and upon which the State levies its business and occupation tax took place within the state of Washington before the goods were repacked for overseas shipment by the GSA, for the State is not attempting to impose a tax upon the machines as an export but rather upon the vendor's privilege of engaging in the business of selling them—a business activity occurring throughout all stages of the transaction between Carrington and the General Services Administration.

The court, as noted, relies on *Richfield Oil Corp. v. State Bd. of Equalization,* 329 U.S. 69, 79, 91 L. Ed. 80, 67 S. Ct. 156 (1946), but I think that case, too, sustains the tax in the present case. There, Richfield Oil Company sold oil taken from California wells and delivered it from its dockside tanks into the tanks of a foreign ship moored at the port. The State of California sought to levy and collect its retail sales tax, a tax measured by the gross value of the delivered oil in the ship's tanks. In accordance with the parties' declared intentions, the oil had been sold, delivered to portside and loaded into the foreign ship for shipment and delivery to a foreign buyer at a foreign port, and all papers relating to the transaction showed this to be so, including the ship's declared destination. Declaring that the delivery of the oil into the tanks of the foreign ship, consigned for delivery to a foreign buyer at a foreign port converted the oil into an export and thus immune from imposition of state sales tax, a divided court in *Richfield* nevertheless adhered to the long-standing general rule in citing *Coe v. Errol, supra:*

". . . [G]oods do not cease to be part of the general mass of property in the State, subject, as such, to its jurisdiction, and to taxation in the usual way, until they have been shipped, or entered with a common carrier for transportation to another State, or have been started

upon such transportation in a continuous route or journey."

And further stated the rule of *Cornell v. Coyne, supra,* which said:

"The true construction of the constitutional provision is that no burden by way of tax or duty can be cast upon the exportation of articles, and does not mean that articles exported are relieved from the prior ordinary burdens of taxation which rest upon all property similarly situated. The exemption attaches to the export and not to the article before its exportation."

*Empresa Siderurgica, S.A. v. County of Merced,* 337 U.S. 154, 93 L. Ed. 1276, 69 S. Ct. 995 (1949), a case I believe to be controlling here amplifies this rule further. In *Siderurgica,* a cement manufacturing plant in California had been sold to and for export to a foreign purchaser and both an export license and a letter of credit were obtained in favor of the seller. The foreign purchaser took title and possession in California and employed a common carrier to dismantle the plant and prepare it for shipment. As the dismantling proceeded, the carrier labeled the components with the purchaser's name as consignee and delivered them to a railroad for shipment. After 12 percent of the plant had been shipped and with the remaining 88 percent of it prepared for shipment, dismantled and not prepared, and some of it not yet dismantled, the County of Merced levied an ad valorem personal property tax on all of the 88 percent which had not yet been shipped. Sustaining the tax upon all of the plant components still unshipped and which could be reached by the County, the court pointed out that even if a diversion of the components from their foreign destination to a domestic would constitute *a breach of contract,* the determinant of export was whether there existed a possibility or capability of diversion. Regardless of the parties' intentions, if the articles could have been diverted from a foreign port—notwithstanding that this diverting would breach the contract—the goods were not to be treated as exports until the export process had been ren-

dered irrevocable. On this point, the court said, at page 157:

So in this case it is not enough that on the tax date there was a purpose and plan to export this property. Nor is it sufficient that in due course that plan was fully executed. Part of the plant that is taxed was dismantled, but it had not been delivered to any carrier for export or otherwise started on its journey on the tax date. It might still have been diverted into the domestic market. The fact that any such diversion would entail a breach of contract, that a part of the plant had already started on its export journey, that an export license had been obtained and a letter of credit deposited in this country increases the expectation on the tax date that exportation of the entire plant would eventuate. But that prospect, no matter how bright, does not start the process of exportation. On the tax date the movement to foreign shores had neither started nor been committed.

The court, in *Empresa Siderurgica* noted that the test in *Coe v. Errol, supra,* was to determine the validity under the commerce clause of nondiscriminatory state tax and that *Richfield* made the test equally applicable to cases arising under U.S. Const. art. 1, § 10. The court further stated the general principles of the earlier cases by saying, at page 156:

Under that test it is not enough that there is an intent to export, or a plan which contemplates exportation, or an integrated series of events which will end with it. [Cases cited.] The tax immunity runs to the process of exportation and the transactions and documents embraced in it.

The court amplified this with a further statement of general principles, at page 157:

It is the entrance of the articles into the export stream that marks the start of the process of exportation. *Then there is certainty* that the goods are headed for their foreign destination and will not be diverted to domestic use. *Nothing less will suffice.*

(Italics mine.) In other words, the goods have not entered the export stream until it is certain that they cannot be

diverted. *Nothing less than certainty of export will suffice to make the goods exports.*

Shortly after *Siderurgica,* the court again held that even a possibility of diversion to a domestic destination kept the goods from being treated as exports for state tax purposes. It ruled that gasoline sold for export and foreign delivery was taxable by the state and not immune as an export even though delivered to a carrier for shipment overseas, because that final and irrevocable joinder into the export stream had not yet been reached. Thus, in *Joy Oil Co. v. State Tax Comm'n,* 337 U.S. 286, 288, 93 L. Ed. 1366, 69 S. Ct. 1075 (1949), the court said:

> While in storage, the gasoline might have been diverted to domestic markets without disruption of any existing arrangement for its transshipment and without even breach of any contractual commitment to a foreign purchaser. Neither the character of the property nor any event equivalent to its redelivery to a common carrier made export certain for all practical purposes. See *Richfield Oil Corp.* v. *State Board,* 329 U. S. 69, 82.

We have earlier adopted principles which I think the court now overrules *sub silentio.* In *Eardley Fisheries Co. v. Seattle,* 50 Wn.2d 566, 568, 314 P.2d 393 (1957), a case which appears to me to be controlling, we set forth the facts as follows:

> The transactions between the appellant and the United States government began and terminated within this state. The seller's responsibility with reference to the commodities ended upon delivery to the purchaser in accordance with the terms of the contracts. The invitation to bid, the bid, the acceptance of that bid, the delivery and acceptance of the goods, and the passage of title to the commodities, all took place within the state of Washington.

And, we put this question: "By this process, had the goods entered into the stream of exportation, thereby rendering them immune from local taxation?"

Holding that the seafood was not an export at the time the tax accrued because *certainty* of export was wanting

even though the goods had been delivered to storage depots for overseas shipment, this court sustained the tax, saying, at page 571:

There was a possibility, within the purview of the rules, that these goods might find their way into domestic commerce. The goods were of a character that made their domestic use possible. This is supported by the court's finding, in the instant case, that similar items, so packed, stored, and purchased from appellant, were domestically consumed.

We conclude that, at the time of delivery of the sea food by appellant and the consummation of the sale to the United States government, the goods in question were not in the stream of export, as that term is defined in the above-cited cases.

The court relies, too, upon *Gough Indus., Inc. v. State Bd. of Equalization,* 51 Cal. 2d 746, 747, 336 P.2d 161 (1959), *cert. denied,* 359 U.S. 1011, 3 L. Ed. 2d 1037, 79 S. Ct. 1151 (1959), which, I think, is readily distinguishable from the instant case. There the goods—electrical products—were sold by a California manufacturer to the Arabian American Oil Company and Trans-Arabian Pipe Line Company for use in Saudi Arabia upon a call for bids by the purchaser:

Bidders were informed that all purchases were made strictly for direct export to scenes of operations in foreign countries and that it was anticipated bidders' quotations would show export prices or export discounts applicable. They were also informed that landing and receiving conditions in Saudi Arabia were such that specialized packing was required and that if they could not fulfill these specialized packing requirements with their own facilities, they should so indicate on their quotations.

In the present case, the goods were not to be packed for export but instead delivered to the GSA in Tacoma which then packed them for overseas shipment. In *Gough,* the goods were delivered to a truck carrier pursuant to an export purchase, then to a packer for overseas packing where title passed to the foreign purchaser, and the packer packed and crated the goods according to the foreign pur-

chaser's instructions and delivered them by truck carrier to the ocean carrier which transported them to Saudi Arabia. Although it could be arguably claimed in *Gough* that the goods were irrevocably exported when the taxpayer transferred title to the foreign purchaser, with delivery to the packer who then, acting as the purchaser's agent and under his direction, packed and crated them and carried them on board the ships, no such argument can sensibly be made here. In the instant case, the GSA at all times as between seller and purchaser retained full discretion to divert the goods to ports in the United States—and in fact did so divert some of them—and they could not be said to be exports at the time the tax was imposed upon Carrington's business of selling them. Here, the machines did not actually become exports at any time prior to delivery to the General Services Administration, and GSA did not serve as agents for Carrington, but as owner in repacking, loading and documenting the machines for overseas transportation and delivery. The equipment sought to be taxed here was domestic goods at all stages of its existence from the point of manufacture to its sale and delivery to a domestic purchaser at a domestic location.

This court now takes the rationale of *Richfield Oil Corp. v. State Bd. of Equalization,* 329 U.S. 69, 91 L. Ed. 80, 67 S. Ct. 156 (1946), beyond its farthest reaches to a point where, if logically applied, it will establish a tax shelter on all domestic commerce which ultimately is destined to wind up in foreign commerce. Although the *Richfield* case involved a sales tax sought to be collected upon oil actually delivered from dockside storage into a ship's tanks for delivery to a foreign purchaser, while the ship floated at dockside, the tax to be collected here is upon the business transaction of retailing occurring with respect to machinery before loading. The Supreme Court in *Kosydar v. National Cash Register Co.,* 417 U.S. 62, 40 L. Ed. 2d 660, 94 S. Ct. 2108 (1974), referring to *Richfield,* subsequently observed "that the delivery of oil into the storage tanks

of a New Zealand-bound steamer 'marked the commencement of the movement of the oil abroad.'" I would not, as the court now does, move the point of irrevocability to a point where it is still revocable. The machinery here, even under the *Richfield* case, cannot, therefore, be classified as exports at a point preceding its repacking by General Services Administration and probably not earlier than the actual loading on board by the General Services Administration.

Whatever doubts may be said to exist as to the application of the *Richfield* case are laid to rest, I think, in *Kosydar v. National Cash Register Co., supra.* There the National Cash Register Company maintained two wholly separate divisions for marketing purposes, one domestic and the other international. All of the taxable activities at issue involved the international division. In accordance with company procedures, when a salesman from the international division received a customer's order, an individual order form would be completed. The machine as ordered would then be built

> to specification, taking into account the commercial peculiarities of the country to which it is to be shipped and the buyer's individual needs.
>
> After manufacture, the machine is inspected, packed, and crated for shipment abroad. The crated machine is then taken to an NCR warehouse in Dayton, to await foreign shipment. The machines relevant to this case were in storage in the Dayton warehouse, awaiting shipment, on December 31, 1967, when the petitioner Tax Commissioner assessed a personal property tax upon them.
>
> NCR appealed the Commissioner's assessment to the Board of Tax Appeals of the Ohio Department of Taxation. Its basic claim was that the "international inventory" in the Dayton warehouse was made up of exports, and thus was immune from State taxation under the Import-Export Clause. In support of this contention, NCR offered evidence to show that, because of their unique construction and special adaptation for foreign use, the crated machines were not salable domestically. Further

evidence was offered to show that no piece of equipment built for the international division has ever gone anywhere but into that division; that there is no recorded instance of a machine that was sold to a foreign purchaser being returned; and that no exported item has ever found its way back into the United States market.

(Footnotes omitted.) Reversing the Supreme Court of Ohio which had sustained the tax immunity, *National Cash Register Co. v. Kosydar,* 35 Ohio St. 2d 166, 298 N.E.2d 559 (1973), and upholding the tax, the United States Supreme Court said:

By its own terms, the prohibition on taxation contained in the Import-Export Clause is absolute; no duties or imposts are allowed "except what may be absolutely necessary for executing [a State's] inspection Laws." Consequently, the essential question in cases involving the Clause is a narrow one: is the property upon which a tax has been sought to be imposed an "export," and thus entitled to protection under the provision's literal terms?

(Footnote omitted.) *Kosydar* describes *Coe v. Errol,* 116 U.S. 517, 29 L. Ed. 715, 6 S. Ct. 475 (1886), as the "seminal case on the subject," and gives renewed vigor to it. That was a case involving a shipment of spruce logs cut in Maine and New Hampshire, and assessed for taxes while detained by low water in Errol, New Hampshire, when being floated downriver to Lewiston, Maine. Reaffirming, the court in *Kosydar* quoted from that earlier *Coe* opinion:

"Do the owner's state of mind in relation to the goods, that is, his intent to export them, and his partial preparation to do so, exempt them from taxation?" 116 U.S., at 525.

That question was answered in the negative. Recognizing that its task was to set a "point in time when State jurisdiction over the commodities of commerce begins and ends," *id.,* at 526, the Court concluded that

"[S]uch goods do not cease to be part of the general mass of property in the State, subject, as such, to its jurisdiction, and to taxation in the usual way, *until they have been shipped, or entered with a common carrier for transportation to another State, or have*

*been started upon such transportation in a continuous route or journey." Id.,* at 527 (emphasis added).

Since the logs in *Coe* had not begun a "final movement for transportation from the State of their origin to that of their destination," *id.,* at 525, the Court held that the Constitution provided no immunity from local taxation.

The basic principle of *Coe* v. *Errol* is a simple one—the exemption from taxation in the Import-Export Clause "attaches to the export and not to the article before its exportation." *Cornell* v. *Coyne,* 192 U. S. 418, 427.

and,

As a practical matter, it might well be doubted that the "diversion potential" of the crated portions of the cement plant in *Empresa Siderurgica* was any greater than that present here. But, even assuming *arguendo* the validity of NCR's arguments about the practical certainty of export here, we think it plain that the warehoused machines are not entitled to the protection of the Import-Export Clause. Mr. Justice Frankfurter put the matter succinctly in *Joy Oil Co.* v. *State Tax Comm'n,* 337 U. S. 286, 288:

"The Export-Import Clause was meant to confer immunity from local taxation upon property being exported, not to relieve property eventually to be exported from its share of the cost of local services."

We may accept as fact the respondent's assurances that the prospect of eventual exportation here was virtually certain. "But that prospect, no matter how bright, does not start the process of exportation. On the tax date the movement to foreign shores had neither started nor been committed." *Empresa Siderurgica, supra,* at 157. Given the absence of an entrance of the respondent's machines into the export stream, the immunities of the Import-Export Clause are unavailable.

and, finally:

As Mr. Justice Holmes put the matter in *A. G. Spalding, supra,* [262 U. S. 66, 67 L. Ed. 865, 43 S. Ct. 485], at 69:

"[W]e have to fix a point at which, in view of the purpose of the Constitution, the export must be said to begin. As elsewhere in the law there will be other points very near to it on the other side, so that if the necessity of fixing one definitely is not remembered any determination may seem arbitrary."

Our prior cases have determined that the protections of the Import-Export Clause are not available until the article at issue begins its physical entry into the stream of exportation. We find no reason to depart from that settled doctrine.

That an article is not an export until it has been irrevocably committed to overseas shipment is the commonsense view—a view supported by the very language of the export-import clause of the federal constitution. U.S. Const. art. 1, § 10. The founders of the constitution could not have selected more precise language to bar the maritime states from levying a toll upon commerce of the inland states and at the same time giving no tax immunity to the articles of commerce and to the services affecting the movement of goods from the place of origin within the separate states to the ports of the nation. Where the constitution uses the nouns "imports" or "exports," it necessarily avoids such terms that describe a process or activity such as importing or exporting; it narrows the tax immunity down to a point where the article described as an "export" has reached the place that it can no longer be said to be a part of the mass of property within a state. The billions of dollars worth of goods piled on the docks of the nation's ports, or within nearby warehouses and storage depots, can hardly be said to be exports at that stage of the journey, even though documented for overseas shipment and ultimate delivery. They and the business activities connected with them are at that point still drawing all of the beneficial and protective services of the state and municipality in which they are kept, including those provided by police, firemen, inspectors and all of their equipment and paraphernalia. They have the use of the public streets, highways, utilities and ports. The courts and the public schools and colleges and publicly-supported medical services have been and remain available to the employees and managers of the businesses connected with the extracting, manufacturing, wholesaling, retailing, transporting, warehousing, loading, unloading activities connected with or affecting the goods. The goods and the

transactions affecting them should, therefore, bear their fair share of the taxes imposed upon them or the businesses connected with them to support the state and local services precisely as do all other goods and businesses so taxed within the state.

ROSELLINI, HUNTER, and HAMILTON, JJ., concur with HALE, C.J.

Petition for rehearing denied January 3, 1975.