[No. 42761. En Banc. November 14, 1974.]

THE CITY OF TACOMA, *Appellant*, v. GENERAL METALS OF TACOMA, INC., *et al.*, *Respondents*.

*Robert R. Hamilton, F. H. Chapin, Jr.,* and *John R. Kramer,* for appellant.

*Bogle, Gates, Dobrin, Wakefield & Long,* by *Philip K. Sweigert,* for respondents.

FINLEY, J.—This case involves the validity of a Tacoma business and occupation tax imposed upon the sale of scrap metal destined for the stream of foreign commerce. The City of Tacoma is appealing an adverse decision of the Pierce County Superior Court that the scrap metal was in the stream of foreign commerce and was, therefore, beyond the reach of municipal business and occupation tax.

Respondent General Metals of Tacoma, Inc. (hereinafter: "General Metals") is engaged in the purchase and sale of scrap metal with its principal place of business located on

the Hylebos Waterway in Tacoma. In 1956, respondent General Metals Export Corp. (hereinafter: "Export Corp.") was formed as a foreign sales affiliate of General Metals. Export Corp. has no office, but operates from that of General Metals. The two corporations have the same president and vice president/general manager. In the case of Export Corp., these two individuals are its only employees. As the same principals own the two respondent corporations, the relationship between the two entities is a so-called "brother-sister" affiliation, rather than that of a parent-subsidiary.

General Metals purchases quantities of scrap metal from various domestic sources. The purchased scrap is delivered to the General Metals facility on the Hylebos Waterway. A portion of the scrap is deposited upon the General Metals export pile to await export. The remainder of the scrap which requires processing is appropriately prepared by General Metals and then added to the export scrap pile. From time to time, General Metals may remove a portion of the export scrap for domestic sale, but this is infrequently done and amounts to less than 5 percent of scrap metal sales which are appropriately taxed.

Export Corp. solicits foreign orders for scrap metal primarily from Asian buyers. Shipment of scrap sold is made exclusively in foreign flag vessels. When the buyer's vessel arrives dockside on the Hylebos Waterway in Tacoma, the ship is loaded with scrap by stevedores under contract with Export Corp. When loaded, the vessel issues the necessary documents accompanied by a letter of credit which Export Corp. negotiates for payment through its bank. Export Corp. is then invoiced by General Metals and Export Corp. makes payment to General Metals.

The interposition of Export Corp. between the foreign purchaser and General Metals has recently taken on a new dimension. Export Corp. has qualified as a Domestic International Sales Corporation ("DISC") under the Revenue Act of 1971, tit. V, §§ 501-07, 85 Stat. 535 (codified in

scattered sections of 26 U.S.C.). The purpose of the DISC provisions is to stimulate export sales by deferring approximately one-half of the federal income taxes upon export profits. *See generally* Department of the Treasury, *DISC: A Handbook for Exporters* (1972). The DISC legislation clearly contemplates corporations similar to Export Corp. which exist solely to further the export sales of a single exporter. *See* Parsons, *Some Thoughts on DISC*, 9 Willamette L.J. 261 (1973); Hill & Repogle, *The Wonderful World of DISC*, 25 Okla. L. Rev. 381 (1972).

Appellant contends that the sale of scrap metal by General Metals to Export Corp. is a wholesaling transaction subject to the Tacoma business and occupation tax. Contrarily, respondents assert that no taxable incident arises as the goods in question are irrevocably committed to the flow of foreign commerce before any transfer is accomplished, and, therefore, beyond the constitutional reach of state or municipal taxation. *See* U.S. Const. art 1, § 10, cl. 2.

It is a well settled constitutional doctrine that a state may not tax goods which have entered the stream of foreign commerce. *See Brown v. Maryland,* 25 U.S. (12 Wheat.) 419, 6 L. Ed. 678 (1827). In a case directly on point, *Richfield Oil Corp. v. State Bd. of Equalization,* 329 U.S. 69, 91 L. Ed. 80, 67 S. Ct. 156 (1946), the State of California sought to levy a sales tax upon the sale of oil bound for New Zealand. In this case, the oil was pumped from Richfield's storage tanks at dockside into a waiting vessel. The United States Supreme Court reasoned that:

> [W]hen the oil was pumped into the hold of the vessel, it passed into the control of a foreign purchaser and there was nothing equivocal in the transaction which created even a probability that the oil would be diverted to domestic use. . . . The means of shipment are unimportant so long as *the certainty of the foreign destination is plain.*

(Italics ours.) *Richfield Oil Corp. v. State Bd. of Equalization, supra* at 83. Thus, the shipment was held to be in the

stream of foreign commerce and beyond the reach of state taxation.

█ The test applied to ascertain and determine whether goods have entered foreign commerce is one of reasonable facility and certainty. As stated in *Empressa Siderurgica, S.A. v. Merced,* 337 U.S. 154, 157, 93 L. Ed. 1276, 69 S. Ct. 995 (1949):

> It is the entrance of the articles into the export stream that marks the start of the process of exportation. Then there is certainty that the goods are headed for their foreign destination and will not be diverted to domestic use. Nothing less will suffice.

The crucial test of entrance into the stream of foreign commerce has been very recently reaffirmed in *Kosydar v. National Cash Register Co.,* 417 U.S. 62, 40 L. Ed. 2d 660, 94 S. Ct. 2108 (1974), in which the court noted there must be "actual movement" of the goods to remove them from the ambit of state taxation.

This court has long recognized the validity of the indicated test and the inherent legal principles prescribing the limits of state taxing authority. In *Eardley Fisheries Co. v. Seattle,* 50 Wn.2d 566, 314 P.2d 393 (1957), we acknowledged that the degree of certainty of export was determinative of the State's ability to tax. *See also Alaska S.S. Co. v. State,* 31 Wn.2d 328, 196 P.2d 1001 (1948).

█ Applying the indicated test to the instant case, we find that the scrap metal in question was unequivocally committed to the stream of foreign commerce. In the instant case, as in *Richfield,* the transfer coincided with the loading of the commodity aboard ship. The vessels loaded by Export Corp. are controlled by a foreign purchaser, and forbidden by federal law from discharging their cargo at a domestic port. *See* Merchant Marine Act of 1920, 46 U.S.C. § 883. Thus, there is no chance that the scrap metal cargo would be diverted for domestic use, and as the scrap had been loaded before the taxable incident arose, it had begun its "actual movement" in the stream of export.

Aside from the constitutional limitations of the State's power to tax, the City of Tacoma is bound by the explicit provisions of its own rules. Tacoma City Rule 177 (identical to WAC 458-20-193C) expressly provides in pertinent part:

> EXPORTS. A deduction is allowed with respect to export sales when as a necessary incident to the contract of sale the seller agrees to, and does deliver the goods (1) to the buyer at a foreign destination; or (2) to a carrier consigned to and for transportation to a foreign destination; or (3) to the buyer at shipside or aboard the buyer's vessel or other vehicle of transportation under circumstances where it is clear the goods will be taken to a foreign destination.
> In all circumstances there must be (a) a certainty of export and (b) the process of export must have started.

The clear intent of the quoted language is to exclude transactions such as those in the instant case. Additionally, we find instructive the interpretation of the State version of rule 177, WAC 458-20-193C, rendered by the Department of Revenue in ETB 448.04.193C relating to the tax treatment of DISC's under WAC 458-20-193C. The Department of Revenue excludes from State business and occupation taxation export transactions between a DISC (Export Corp.) and its affiliated supplier (General Metals). Hence, the transaction in question is not taxable under WAC 458-20-193C which is virtually identical to Tacoma's rule 177.

We must conclude, therefore, that not only is the export sale of scrap metal beyond the constitutional reach of Tacoma's taxing power, but also the transaction in question is not taxable under Tacoma's own rule. The judgment of the Superior Court should be affirmed. It is so ordered.

STAFFORD, WRIGHT, UTTER, and BRACHTENBACH, JJ., concur.

HALE, C.J. (dissenting)—I dissent. The court's opinion expands the term *export* far beyond its constitutional meaning and I think gives it a significance never contemplated by the Constitution of the United States. Although a

state may not tax exports per se, the court holds that it likewise cannot tax the process of exporting, nor the business of manufacturing, hauling, processing, financing, fabricating, warehousing or the transaction of any other business in connection with any of these processes affecting the article to be exported. Nearly everything destined for shipment to the ports for overseas delivery, by this opinion and contrary to the intendment of the constitution, may be converted into an export from the moment it is so declared an export by a producer, manufacturer, seller, or broker.

While paying a modicum of deference—amounting to no more than a tip of the judicial hat—to the idea of irrevocability of export, the court cleaves to what I think is a mistaken and nebulous concept that the goods become exports when they have entered the stream of foreign commerce. For this principle, it cites a number of cases dealing with *interstate*—as distinguished from foreign—commerce and caps this rationale with reliance upon *Kosydar v. National Cash Register Co.*, 417 U.S. 62, 40 L. Ed. 2d 660, 94 S. Ct. 2108 (1974), a case which I think holds precisely the opposite of the majority opinion.

I would cite *Kosydar*, therefore, in direct support of the proposition that the scrap metal stored on the docks at the Hylebos Waterway was a part of the mass of goods within the city of Tacoma and the state of Washington. *Kosydar* was, I think, properly cited to uphold a similar tax in the dissenting opinion in *Carrington Co. v. Department of Revenue*, 84 Wn.2d 444, 527 P.2d 74 (1974) which opinion I would restate here.

Article 1, section 10 of the Constitution of the United States declares, in part:

> No state shall, without the consent of the congress, *lay any imposts or duties on imports or exports,* except what may be absolutely necessary for executing its inspection laws: and the net produce of all duties and imposts, laid by any state on imports or exports, shall be for the use of

the treasury of the United States; and all such laws shall be subject to the revision and control of the congress.

(Italics mine.)

One should note in this provision the precise use of the nouns *imports* and *exports* and ipso facto the avoidance of such broader and more vague concepts as foreign commerce or foreign trade or general terms describing commerce occurring among or between the states. Even with respect to interstate transactions, Congress is empowered only to regulate commerce with foreign nations and among the several states. U.S. Const. art. 1, § 8, cl. 3. Thus, the constitution does not authorize Congress to deprive the states of power to tax foreign commerce nor interstate commerce either; nor does the constitution authorize Congress to prohibit the state taxation of business activities or processing occurring within the several states or the taxation of goods while they are a part of the mass of property within a state, for that matter. And with respect to goods destined for foreign delivery, the prohibition is limited to goods specifically defined as *imports* and *exports*. Thus, the power to prohibit state taxation does not extend to transactions connected with such goods before they have become exports nor after they have ceased to be imports.

That the framers of the constitution did not intend to bar the several states from imposing reasonable, that is nonconfiscating, taxes upon goods and property within the state nor upon services connected with them and performed within the states before the goods have become exports, is clear from the language used. Employing only the most explicit and narrow terms to bar the states from taxing imports and exports, the constitution does not prohibit a state tax upon the importing or exporting or the wholesaling, retailing, hauling, processing, fabricating, storing, financing, factoring or rendering a service with respect to them.

As it did in *Carrington*, the court now takes the goods which may ultimately be shipped in foreign commerce to a

foreign consignee, and by necessary implication relates the term *export* back to all or nearly all transactions affecting them wheresoever the transaction may have taken place and in whatever state. The court, I think, has fashioned a rule which shelters the goods and commodities from state and local taxes during all their phases or transactions as exports under the nebulous theory that somewhere long before being loaded aboard ship or plane they had entered the export stream—a concept I find unjustified by either the power to regulate foreign commerce or the express constitutional prohibition barring the taxation of *exports* or *imports*.

Nearly everything we produce and consume in this country, including the movement of money and credit, enters a stream of commerce at one stage or another of its development, and a good share of it enters the stream of foreign commerce. All of the processes and businesses connected with it and occurring within the state of Washington are and, in my opinion, should be subject to State business and occupation taxes. The goods do not become exempt as exports, I think, until they reach a point in the journey where they have been irrevocably severed from and cannot be said to be a part of the mass of goods and property within the state. That, in my view, is the holding in *Kosydar, supra.* As a further rationale, I would restate and adopt the dissenting opinion in *Carrington Co. v. Department of Revenue,* 84 Wn.2d 444, 527 P.2d (1974).

HUNTER, J., concurs with HALE, C.J.

HAMILTON, J. (dissenting)—I concur in result of the dissent for reasons stated in the dissenting opinion in *Carrington Co. v. Department of Revenue,* 84 Wn.2d 444, 527 P.2d 74 (1974).

ROSELLINI, J., concurs with HAMILTON, J.