CARL N. BYERS, Judge Pro Tempore.
 

 Plaintiff is a grain broker and sells domestic grain in the foreign market. During the year in question, plaintiff operated a port-owned grain elevator located on the banks of the Willamette River in Portland, Oregon. Multnomah County assessed the grain in the elevator for taxation as of January 1, 1977, and defendant issued its Opinion and Order No. VL 78-647 upholding such action. Plaintiff appeals and contends that the grain in the elevator was exempt from taxation on three separate grounds: (a) the Import-Export Clause of the United States Constitution, (b) Oregon’s "free port” exemption and (c) under the Oregon Admission Act.
 

 The facts are undisputed and were established primarily by one witness on behalf of the plaintiff. The grain in question is purchased from sources both within and without the State of Oregon. Plaintiff’s purchasing department buys the grain from local farmers, farmers’ cooperatives and "country” elevators. The grain is left in storage where purchased until plaintiff has the need for it to fill an order, at which time it "calls up” the grain. The grain is then brought to the export elevator by rail or truck.
 

 The elevator used for the grain in question is the newest of its kind. Owned by the Port of Portland, it is highly automated and designed solely to load ships. The elevator is not for storage and no storage fees are charged. Grain is loaded into the top of the elevator and unloaded from the bottom, with the total elevator capacity being turned every 9 to 12 days. Only export grain is processed through this elevator. Mr. Clifford
 
 *[207]
 
 Hoover, plaintiffs witness, testified that the cost of processing grain for the domestic market through this elevator would exceed the profit margin available in the domestic market.
 

 Plaintiff’s records establish that approximately one-half of the grain is obtained from sources outside the State of Oregon, primarily from Idaho, Washington and Montana.
 

 Plaintiff was aware of the need to file a personal property tax return. Plaintiff intended to claim all of the grain in question exempt under the free port statute. Mr. Hoover testified that he called the Mult-nomah County Assessor’s office and asked for an exemption form. He was sent a form used for claiming exemption on property held for exportation. It was not the form specified by the statutes and regulations for claiming the free port exemption. Mr. Hoover stated that he was not aware that it was the wrong form until later. This was Mr. Hoover’s first experience in a filing for the free port exemption and he was unfamiliar with the forms.
 

 Defendant has denied the claim for exemption under the free port statutes on dual grounds; that only grain originating from outside the state is eligible for the exemption and on the grounds that plaintiff failed to file a correct claim form.
 

 Import-Export Clause:
 
 Plaintiff seeks to have the entire grain in question declared exempt under the Import-Export Clause of the United States Constitution. The relevant portion of the Constitution merely provides:
 

 "No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, * * (US Const, art I, § 10, cl 2.)
 

 Like all basic rules, this language has been the subject of many court cases. Consequently, its meaning as applied to a specific set of circumstances must be derived from a number of cases.
 

 
 *[208]
 
 The bench mark case of
 
 Coe v. Errol,
 
 116 US 517, 6 S Ct 475, 29 L Ed 715 (1886), dictates that we must distinguish between goods originating in the state and those originating from without. From the taxing state’s point of view, goods which originate from without the state enter the state already impressed with the status of "nontaxable” and so remain until they come to rest within the state. Whether exempt under the Import-Export Clause or the Interstate Commerce Clause, such goods lose their exempt status only upon interruption of their interstate journey for the benefit or purpose of the owner.
 
 Susquehanna Coal Co. v. South Amboy,
 
 228 US 665, 33 S Ct 712, 57 L Ed 1015 (1913). If, as in
 
 Coe v. Errol, supra,
 
 physical movement of the goods is temporarily halted out of physical necessity arising from the mode of shipment, such goods do not become taxable by the state. In
 
 Coe,
 
 logs were stored on the banks of the Androscoggin River awaiting an appropriate time to be dumped into the river and floated out of the state. Here, the grain from outside Oregon was placed in an export elevator awaiting a ship to receive such grain. Such cessation of movement was not for the plaintiff’s benefit but was made necessary by the method of handling the commodity for export.
 
 Carson Petroleum Co. v. Vial,
 
 279 US 95, 49 S Ct 292, 73 L Ed 626 (1929). In such circumstances, the grain did not lose its character as transitory property passing through the state. Therefore, Oregon did not acquire jurisdiction as to such property to impose a tax upon it. Of the total grain in question, the evidence showed that 588,928 bushels, or $1,644,905 of assessed value originated from without the state and was therefore exempt.
 

 The grain originating within the State of Oregon comes into existence subject to tax and remains so until it begins the export process which separates it from the taxing authority of the state. The accepted rule and test to be applied is whether the goods claimed to be exempt have begun their actual movement to foreign shores.
 
 Empresa Siderurgica, S. A. v.
 
 
 *[209]
 

 Merced,
 
 337 US 154, 69 S Ct 995, 93 L Ed 1276 (1949). Certainty of export is not enough. As expressed in the more recent case of
 
 Kosydar v. National Cash Register Co.,
 
 417 US 62, 94 S Ct 2108, 40 L Ed2d 660 (1974), where the court found that machines which were specifically manufactured and admittedly suitable for use only in foreign countries were not exempt, the court stated:
 

 "* * * [I]t would require a sharp departure from nearly a century of precedents under the Import-Export Clause for us to conclude that the machines were 'exports’ and exempt from state taxation.” (417 US at 69, 94 S Ct at 2113, 40 L Ed2d at 666.)
 

 Plaintiff contends that the grain originating in Oregon begins its export process when it leaves the country elevators for the deepwater port. Plaintiff argues that the gathering to "entrepot” as described in
 
 Coe v. Errol, supra,
 
 takes place at the country elevators. That may be possible in some cases, but such is not the evidence in this case. The evidence submitted to the court indicated that the plaintiff purchases its grain from farmers, farmers’ cooperatives and other elevators. There was no evidence that the purchased grain was then gathered or moved to a country elevator awaiting export. Even if the grain were so gathered it is not clear in these circumstances, where the grain is not specifically designated for specific foreign countries, that movement from the country elevator to the deepwater elevator is part of the export process. As stated in
 
 Coe v. Errol:
 

 "* * * When the products of the farm or the forest are collected and brought in from the surrounding country to a town or station serving as an
 
 entrepot
 
 for that particular region, whether on a river or a line of railroad, such products are not yet exports nor are they in process of exportation, nor is exportation begun until they are committed to the common carrier for transportation out of the State to the State of their destination or have started on their ultimate passage to that State. * * *
 

 «ífc ‡ sfc ifc
 
 *
 

 
 *[210]
 
 "* * * The carrying of them in carts or other vehicles or even floating them to the depot where the journey is to commence is no part of that journey. That is all preliminary work, performed for the purpose of putting the property in a state of preparation and readiness for transportation. * * * Carrying it from the farm or the forest to the depot is only an interior movement of the property, entirely within the State, for the purpose, it is true, but only for the purpose, of putting it into a course of exportation; it is no part of the exportation itself. * * *” (116 US at 525 and 528, 6 S Ct at 477 and 479, 29 L Ed at 718-719.)
 

 It is interesting to note that in
 
 Farmers’ Rice Cooperative v. County of Yolo,
 
 14 Cal3d 616, 122 Cal Rptr 65, 536 P2d 465 (1975), the court held that delivery to a common carrier for purely intrastate travel did not constitute the beginning of the process of exportation. Most of the recent cases dealing with the question of movement involve the intrastate movement of goods and then the goods are assessed for tax while awaiting shipment out of the state. This was true in
 
 Kosydar, supra
 
 (where the machines were moved from the manufacturing facility to the foreign shipment warehouse), as well as in cases such as
 
 Sumitomo Forestry Co., Ltd. of Japan v. Thurston Cty, Wash.,
 
 504 F2d 604 (9th Cir 1974),
 
 cert denied,
 
 423 US 831 (1975),
 
 rehearing denied,
 
 423 US 1081 (1976) (where logs were moved from the places of harvest to the portside dock awaiting a ship), and in this court’s own recent decision in
 
 Mitsubishi Intl. Corp. v. Dept. of Rev.,
 
 8 OTR 97 (1979). In all of these cases, it is not just movement in the direction of the foreign country but the beginning of the "final movement” that constitutes the beginning of the export process. It is that sometimes elusive point in time when the tangible item begins to move and such movement will, if continued, take it across the state’s boundaries. The evidence here indicates that such movement did not begin until the grain left the elevator in question and was loaded onto the ship that took it to its foreign port.
 

 
 *[211]
 

 Free port exemption:
 
 Plaintiff contends that it substantially complied with the requirements of ORS 307.810 et seq.; that the grain in question should be exempt under such statute. The statute is clear that it exempts only grain or goods which are produced outside the state and are found in the state only by virtue of their being in transit through the state. Consequently, the grain originating within Oregon does not qualify. That grain originating from without the state has already been determined by the court to be exempt under the Import-Export Clause of the Constitution. Consequently, it is not necessary to determine whether plaintiff met the requirements of the statute. However, the court does believe that the circumstances of this case merit comment on the forms in question. The personal property tax return published by the state (PI Ex 3) contains a "free port” section that states: "Separate affidavit must be filed on or before April 1—this date cannot be extended.” At the same time, the "affidavit” form specified by the defendant is not entitled an "affidavit” nor is that term to be found anywhere on the form. Moreover, the form, which the defendant contends is the only correct form that can be used, is not labeled "free port.” In short, it requires a careful reading and a knowledge of statutory sections to apprehend that the "claim” form (PI Ex 4) is the "affidavit” referred to in the personal property return. The department may not expect the use of particular forms to be strictly enforced where such confusing terminology is used. One could well speculate that the confusion exists not only on the part of many taxpayers but also in some assessors’ offices since it appears that the wrong form was sent to the taxpayer here.
 

 Oregon Admission Act:
 
 Plaintiff’s final contention is that all of the grain in question is exempt under the requirements of Oregon’s Admission Act. In that act, the United States Congress imposed, as a condition of Oregon’s being admitted as a state in the Union, the following:
 

 
 *[212]
 
 "Section 2.
 
 Jurisdiction over waters forming boundary of state; use of navigable waters as free highways.
 
 That the said State of Oregon shall have concurrent jurisdiction on the Columbia and all other rivers and waters bordering on the said State of Oregon, so far as the same shall form a common boundary to said State, and any other State or States now or hereafter to be formed or bounded by the same; and said rivers and waters, and all the navigable waters of said State, shall be common highways and forever free, as well as to the inhabitants of said State as to all other citizens of the United States, without any tax, duty, impost, or toll therefor.” (11 Stat 383 (1859).)
 

 Plaintiff contends that because the elevator is located on the Willamette River, a navigable river, and the grain is being shipped upon such river, the grain therefore must be exempt from tax under the above language.
 

 Plaintiff cites no authority for its position and the court needs none in finding that the tax is not in any way related to the use of the river. The tax in question is an ad valorem tax of general application. To follow plaintiff’s logic, any vehicle using the river, any commodity shipped on the river, and perhaps any business connected with the river would be exempt. Such an interpretation is clearly unreasonable. The express intent of Congress was to preserve the use of the river for commerce and other uses and not to exempt from tax such goods as may be moved on or across the river.
 

 Accordingly, the one-half of the grain in question originating in the State of Oregon, having a reported value of $1,629,256, is not exempt from tax, while the grain originating from outside the State of Oregon, having a reported value of $1,644,905, is exempt.
 

 Defendant’s Order No. VL 78-645, dated November 21, 1978, is affirmed as to the grain originating in the State of Oregon and reversed as to the grain originating outside the State of Oregon, in accordance with this decision. Costs to neither party.